# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GREGORY PEARCE, individually and on
behalf of all others similarly situated,

    *Plaintiff*,

    v.

MIZUHO BANK, LTD., a Japanese financial
institution, and MARK KARPELES, an
individual,

    *Defendants*.

Case No. 18-cv-00306

Hon. Robert F. Kelly

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND ................................................................................... 2

ARGUMENT ........................................................................................................... 6

    **I.**    **This Court Has Personal Jurisdiction Over Mizuho** ............................. 6

    **II.**    **The Complaint States Claim for Tortious Interference With Contract** .................................................................................... 11

        *A.*    *Mizuho Purposefully Intended to Harm Pearce's Relationship With Mt. Gox.* ......................................................... 12

        *B.*    *Mizuho's Conduct Was Unjustified* ............................................ 15

        *C.*    *Pearce Was Harmed By Mizuho's Tortious Conduct* .................. 18

CONCLUSION ..................................................................................................... 19

## TABLE OF AUTHORITIES

**United States Supreme Court Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ...................................................................................................11

*Bristol-Myers Squibb Co. v. Superior Court of California,*
    137 S. Ct. 1773 (2017)...............................................................................................5, 6

*Burger King Corp. v. Rudzewicz,*
    471 U.S. 462 (1985) ....................................................................................................7

*Calder v. Jones,*
    465 U.S. 783 (1984) ....................................................................................................6

*Gomez v. Toledo,*
    446 U.S. 635 (1980) ...............................................................................................15, 19

*Keeton v. Hustler Magazine Inc.,*
    465 U.S. 770 (1984) ...................................................................................................10

*Walden v. Fiore,*
    134 S. Ct. 1115 (2013)........................................................................................*passim*

**United States Circuit Court of Appeals Cases**

*Acorda Therapeutics Inc. v. Mylan Pharm. Inc.,*
    817 F.3d 755 (Fed. Cir. 2016)........................................................................ 7, 8, 9, 10

*Mayer v. Belichick,*
    605 F.3d 223 (3d Cir. 2010)........................................................................................15

*Metcalfe v. Renaissance Marine, Inc.,*
    566 F.3d 324 (3d Cir. 2009)........................................................................................6

*O'Connor v. Sandy Lane Hotel Co., Ltd.,*
    496 F.3d 312 (3d Cir. 2007)......................................................................................6, 7

*Pennzoil Prods. Co. v. Colelli & Assocs.,*
    149 F.3d 197 (3d Cir. 1998)........................................................................................6

*Phillips v. Cty. of Allegheny,*
    515 F.3d 1224 (3d Cir. 2008)..................................................................................11, 15

*Pinker v. Roche Holdings Ltd.,*
    292 F.3d 361 (3d Cir. 2002)........................................................................................11

*Prudential Real Estate Affiliates, Inc. v. Long & Foster Real Estate, Inc.*,
    208 F.3d 210 (4th Cir. 2000) ......................................................................... 14

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
    627 F.3d 85 (3d Cir. 2010) ............................................................................ 11

**United States District Court Cases**

*Christie v. Nat'l Inst. for Newman Studies*,
    258 F. Supp. 3d 494 (D.N.J. 2017) ............................................................. 7, 10

*Corrections U.S.A. v. McNanyi*,
    892 F. Supp. 2d 626 (M.D. Pa. 2012) ........................................................ 17, 18

*Fishkin v. Susquehanna Partners, G.P.*,
    563 F. Supp. 2d 547 (E.D. Pa. 2008) ............................................................. 16

*Gianacopoulos v. MOS Design, Inc.*,
    No. CIV.A. 3:05-2417, 2008 WL 1774094 (M.D. Pa. Apr. 16, 2008) ............ 12

*Greene v. Mizuho Bank, Ltd.*,
    No. 1:14-cv-01437 (N.D. Ill. Mar. 7, 2017) ..................................................... 5

*Greene v. Mizuho Bank, Ltd.*,
    169 F. Supp. 3d 855 (N.D. Ill. 2016) ............................................................. 10

*In re: MtGox Co., Ltd.*,
    No. 14-31229-sgj-15 (Bankr. N.D. Te.) ........................................................... 3

*In re Prithvi Catalytic, Inc.*,
    571 B.R. 105 (Bankr. W.D. Pa. 2017) ........................................................... 14

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
    No. 13-MD-2445, 2017 WL 4910673 (E.D. Pa. Oct. 30, 2017) ................ 15, 19

*McCullough v. Peeples*,
    No. CIV.A. 3:14-123, 2015 WL 1000223 (W.D. Pa. Mar. 5, 2015) ............... 15

*Mid-Continent Tel. Corp. v. Home Tel. Co.*,
    319 F. Supp. 1176 (N.D. Miss. 1970) ........................................................... 14

*Payton v. Kale Realty*,
    No. 13 C 8002, 2014 WL 4214917 (N.D. Ill. Aug. 26, 2014) ........................ 10

*Pennsylvania by Shapiro v. Think Fin., Inc.*,
    No. 14-CV-7139, 2018 WL 637656 (E.D. Pa. Jan. 31, 2018) ....................... 7, 8

*Synthes, Inc. v. Emerge Med., Inc.*,
    25 F. Supp. 3d 617 (E.D. Pa. 2014) ..................................................................... 13, 14

*Thompson v. United States*,
    No. CV 16-3287, 2017 WL 2972679 (E.D. Pa. July 12, 2017) .............................. 6

*Total Care Sys., Inc. v. Coons*,
    860 F. Supp. 236 (E.D. Pa. 1994) .......................................................................... 16

**State Cases**

*Bolger v. Danley Lumber Co.*,
    395 N.E.2d 1066 (Ill. App. 1979) ........................................................................... 12

*Empire Trucking Co. v. Reading Anthracite Coal Co.*,
    71 A.3d 923 (Pa. Super. Ct. 2013) ..................................................................*passim*

*Glenn v. Point Park Coll.*,
    272 A.2d 895 (1971) ........................................................................................... 16, 17

*Int'l Diamond Imps., Ltd. v. Singularity Clark, L.P.*,
    40 A.3d 1261 (Pa. Super. Ct. 2012) ....................................................................... 12

*Phillips v. Selig*,
    959 A.2d 420 (Pa. Super. Ct. 2008) ....................................................................... 17

*Ruffing v. 84 Lumber Co.*,
    600 A.2d 545 (Pa. Super. Ct. 1991) ....................................................................... 14

*Salsgiver Commc'ns, Inc. v. Consol. Commc'ns Holdings, Inc.*,
    150 A.3d 957 (Pa. Super. Ct. 2016) .................................................................. 16, 17

*Shiner v. Moriarty*,
    706 A.2d 1228 (Pa. Super. Ct. 1998) ..................................................................... 18

*Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc.*,
    982 A.2d 94 (Pa. Super. Ct. 2009) .............................................................. 11, 14, 16

**Rules and Statutory Provisions**

31 C.F.R. § 103.33(g)(1) ............................................................................................... 3

42 Pa. Cons. Stat. Ann. § 5322 ..................................................................................... 6

Fed. R. Civ. P. 9 .......................................................................................................... 12

Fed. R. Civ. P. 12 ..................................................................................................*passim*

**Other Authorities**

Location of Offices Outside Japan (As of June 30, 2017), Mizuho Financial Group, Inc.,
        https://bit.ly/2INeizn (last accessed May 25, 2018) ........................................................9

Restatement (Second) of Torts § 8 .................................................................................. 12

Restatement (Second) of Torts § 433 ............................................................................... 18

Restatement (Second) of Torts § 766 .................................................................12, 14, 18, 19

Restatement (Second) of Torts § 767 ............................................................................... 16

Restatement (Second) of Torts § 774 ............................................................................... 18

## INTRODUCTION

This case arises from the collapse of Mt. Gox, once the world's largest bitcoin exchange. Mt. Gox shuttered without warning in February 2014, taking with it millions (if not hundreds of millions) of dollars' worth of users' bitcoin and cash. There is plenty of blame for these losses to go around, and some must be laid at the feet of Defendant Mark Karpeles, Mt. Gox's erstwhile CEO. But the actions of defendant Mizuho Bank, Ltd. ("Mizuho"), Mt. Gox's banking partner for United States users, also led to substantial losses among prospective Mt. Gox investors. Beginning in June 2013, Mizuho began a campaign to significantly disrupt Mt. Gox's ability to serve American users by, among other things, unilaterally refusing to process withdrawals for U.S. users who already held bitcoin or money on the exchange. Mizuho hoped that by doing so Mt. Gox would be forced to find another bank to service U.S. investors.

Mizuho shielded these actions from public scrutiny, withholding critical information from thousands of Americans. This included Pearce, who transferred bitcoin onto the exchange and sold some of it for $5,900 in fiat currency prior to the exchange's collapse. Pearce did so believing that he would be able to get that money out, according to the terms of his contract with Mt. Gox. But because of Mizuho's actions, Mt. Gox could not transmit the $5,900 to Pearce when he asked for it. Mizuho's actions—which have already been found by one federal judge to constitute tortious interference with the contracts between Mt. Gox and its customers in the United States, *Greene, et al. v. Mizuho Bank, Ltd., et al.*, 206 F.Supp. 3d 1362 (N.D. Ill. 2016)— give rise to Pearce's claim against the bank for intentional interference with contract.

Mizuho now moves to dismiss the complaint under Fed. R. Civ. P. 12(b)(2) and 12(b)(6), arguing that the Court lacks personal jurisdiction over it and that Pearce's complaint fails to state a claim for relief. These arguments should be rejected.

*First*, Mizuho suggests that the Court lacks specific personal jurisdiction over it because the conduct underlying Pearce's claims occurred in Japan. This is not entirely true, as Mizuho maintains contacts with Pennsylvania through another, securities-related subsidiary of its parent company. More importantly, Mizuho only interfered with Pearce's contract with Mt. Gox *because* of his Pennsylvania residency—i.e., as part of its directed efforts to undermine the relationship between Mt. Gox and its American customers—making its conduct purposefully directed at the state.

*Second*, Mizuho contends that that the Complaint fails to state a claim for tortious interference against Mizuho because Pearce does not allege that Mizuho was aware of his contract with Mt. Gox, does not allege that Mizuho's conduct was unjustified, and does not allege damages. But Mizuho's arguments are largely ones for later in the case. Here, Pearce alleges Mizuho's constructive knowledge of the relevant contract, that Mizuho's conduct violated the rules of the game for exchanges like Mt. Gox, and that he was damaged specifically because of Mizuho's conduct. Given these allegations, Mizuho's motion to dismiss should be denied.

## FACTUAL BACKGROUND

Mt. Gox was a platform for buying and selling bitcoin (a "bitcoin exchange") founded in 2009, and was owned and operated by Defendant Mark Karpeles. (Compl. ¶¶ 9, 14.) It once claimed to be the "world's most established Bitcoin exchange." (*Id* ¶ 9.) To use the exchange, users had to create an account at www.mtgox.com and agree to its Terms of Use. (*Id.* ¶ 10.) In the Terms of Use, Mt. Gox pledged to "hold all monetary sums and all Bitcoins deposited" by the user, and make a user's funds available to them on demand. (*Id.*) To make purchases of

bitcoin (or trade cash for bitcoin, or vice versa), users could either transfer bitcoins into their Mt. Gox accounts or wire money to those accounts from a bank. (*Id.* ¶ 12.)

Defendant Mizuho, a Japanese bank that conducts business worldwide—including a sister entity in Pennsylvania focused on securities trading—was Mt. Gox's banking partner responsible for facilitating international cash wire transfers into and out of Mt. Gox. (*Id.* ¶ 18.) Mizuho was indispensable to Mt. Gox's functioning because the company was, as of mid-2013, the exclusive processor of bank deposits and withdrawals made for thousands of U.S.-based Mt. Gox users. (*Id.* ¶ 21; *In re: MtGox Co., Ltd.*, No. 14-31229-sgj-15 (Bankr. N.D. Tex.), Declaration of Kobyashi in Support of Petition for Recognition, dkt. 127 at ¶ 24 ("I currently have information on the location of approximately 80,000 customers … approximately 30,701 customers are located in the United States.").) Mizuho received a service fee from users on each transaction into or out of the exchange. (Compl. ¶¶ 27–28.)

Mizuho was aware of Mt. Gox's contractual relationship with its customers in the United States. Wire transfers from users into the exchange, sent to Mizuho, designated Mt. Gox as the beneficiary and Mizuho as the beneficiary's bank; they also included the user account number of the Mt. Gox user, along with users' address information. (*Id.* ¶¶ 19–20; *see also* 31 C.F.R. § 103.33(g)(1).) To withdraw funds from Mt. Gox, users had to submit requests to withdraw funds through their online Mt. Gox account. Mt Gox would compile the requests it received (including the user's personal and banking information) and provide the requests to Mizuho for processing and transfer to the user's bank. (Compl. ¶ 20.)

Beginning in 2013, Mizuho grew concerned by Mt. Gox's growing transaction volumes, as well as reports that U.S. authorities were investigating the exchange for money laundering. It therefore sought to end the parties' relationship and distance itself from Mt. Gox and Karpeles.

3

(*Id*. ¶¶ 22–23.) Rather than terminate the relationship outright, however, Mizuho wanted Mt. Gox to be the one to officially sever it. (*Id*. ¶ 23.) But Karpeles wouldn't be bullied and refused to close Mt. Gox's accounts at Mizuho. (*Id*.) To force Karpeles' hand, beginning in June 2013 Mizuho implemented a series of policies designed to frustrate Mt. Gox's business by disrupting and harming its customer relationships—particularly targeting Mt. Gox's relationships with its customers in the United States. (*Id*. ¶ 24.) Most significantly, Mizuho limited the number of withdrawals it would process, making it near-impossible for users to withdraw money from the exchange. (*Id*. ¶¶ 2, 24.) Ultimately, in June 2013, Mizuho stopped processing international wire withdrawals altogether—leaving American customers of the Exchange high and dry, virtually unable to get money into or out of their Mt. Gox accounts. (*Id*. ¶¶ 2, 25–26.)

Mizuho actively concealed its policies towards Mt. Gox from the public. In fact, it actively fostered the perception that the banking relationship was healthy by continuing to accept deposits into Mt. Gox users' accounts (including deposits it received from the United States), and collecting the attendant fees. (*Id*. ¶¶ 27–28.) Further, Mizuho pressured Mt. Gox to keep it from revealing that it had stopped processing withdrawals, or that it wanted to terminate its relationship with Mt. Gox. (*Id*. ¶¶ 31–32.) Mizuho also knowingly remained silent as Mt. Gox falsely assured users and the public that any withdrawal issues were temporary, failing to alert anyone that it had unilaterally stopped processing withdrawals from the exchange for Mt. Gox's American customers. (*Id*. ¶¶ 29–34.) For example, Mizuho said nothing as Karpeles falsely told the world that withdrawal delays were "due to a change in [Mt. Gox's] banking systems" creating a "back-log" of withdrawal requests. (*Id*. ¶ 29.) Mizuho maintained its silence because it knew that if United States users of Mt. Gox found out about its policies and practices, they would stop making deposits, depriving Mizuho of transaction fees. (*Id*. ¶ 27.) Even more

4

important to the bank, Mizuho might be viewed as contributing to Mt. Gox's problems (it was, after all, making it impossible for the exchange to service its customers in the United States) and draw scrutiny from regulators. (*Id.* ¶¶ 27–28.) By accepting deposits while concealing its conduct concerning withdrawals, Mizuho directly contributed to the mistaken belief that Mt. Gox was operating normally, while making it virtually impossible for Mt. Gox to fulfill its contractual obligations to its American customers. (*Id.* ¶¶ 2, 82.)

Mizuho's policies and active concealment of them directly affected Mt. Gox users like Plaintiff Gregory Pearce. Pearce joined Mt. Gox in or around November 2013, transferring bitcoin purchased on another exchange to his account at Mt. Gox. (*Id.* ¶¶ 42–43.) Before joining, Pearce familiarized himself with Mt. Gox's representations about the Exchange's security and reliability, as well as users' ability to withdraw or deposit bitcoins and/or fiat currency at any time. (*Id.* ¶ 42.) Pearce later traded some of his bitcoin for currency, and in January 2014 attempted to immediately withdraw $5,900 USD from his account. (*Id.* ¶ 45–46.) But because of Mizuho's refusal to process currency withdrawals, that request was not processed and Pearce was unable to withdraw the money and bitcoin from his Mt. Gox account before the exchange's collapse. (*Id.* ¶ 46, 49.) He lost the entirety of his Mt. Gox holdings as a result. (*Id.* ¶ 50)

In late February 2014, Mt. Gox was forced to shut down and file for bankruptcy. (*Id.* ¶¶ 35–41.) Subsequently, individuals harmed by Mt. Gox's and Mizuho's conduct filed suit in the Northern District of Illinois on behalf of themselves and other U.S. Mt. Gox users. *See Greene v. Mizuho Bank, Ltd.*, No. 1:14-cv-01437, dkt. 245 (N.D. Ill. Mar. 7, 2017). Pearce was added as a plaintiff in that case on March 7, 2017. *Id.* On June 19, 2017, the Supreme Court held in *Bristol-Myers Squibb Co. v. Superior Court of California* that courts do not have personal jurisdiction over nonresident plaintiff claims solely because those claims are identical to a resident plaintiff's

claims in the same suit. 137 S. Ct. 1773, 1780–82 (2017). Because personal jurisdiction over

Pearce, a Pennsylvania resident, had been based on the court's jurisdiction over an Illinois party,

the *Greene* court reconsidered an earlier personal jurisdiction ruling and dismissed Pearce from

the case without prejudice, precipitating this lawsuit. *See Greene*, No. 1:13-cv-01437, dkt. 312.

## ARGUMENT

### I.    This Court Has Personal Jurisdiction Over Mizuho.

When a motion to dismiss raises the issue of personal jurisdiction, a plaintiff must make a

*prima facie* showing of jurisdictional facts. *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324,

330 (3d Cir. 2009). He may do so through the complaint, affidavits, and other competent

evidence. *Id.* In making such a showing, plaintiffs are entitled to have all jurisdictional

allegations taken as true and all factual disputes resolved in their favor. *Id.* at 330–31.

Pennsylvania's long-arm statute authorizes this Court to exercise personal jurisdiction to

the full extent permitted by due process. *Pennzoil Prods. Co. v. Colelli & Assocs.*, 149 F.3d 197,

200 (3d Cir. 1998) (citing 42 Pa. Cons. Stat. Ann. § 5322). Federal courts may exercise specific

personal jurisdiction over nonresident defendants when (1) they have purposefully directed their

conduct towards a resident of the forum state, (2) the claims arise from that conduct, and (3)

exercising jurisdiction comports with notions of fair play and substantial justice.[1] *Walden v.*

*Fiore*, 134 S. Ct. 1115, 1124 (2013); *Metcalfe*, 566 F.3d at 334. This inquiry is "fact-sensitive,"

and the nature of the claim or tort at issue affects the analysis of whether a party has purposefully

directed their conduct at the forum. *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 323

(3d Cir. 2007); *see Walden*, 134 S. Ct. at 1123 (discussing *Calder v. Jones*, 465 U.S. 783 (1984)

---

[1] Mizuho does not argue that exercising personal jurisdiction would offend traditional notions of fair play and substantial justice. As such, the argument is waived. *See Thompson v. United States*, No. CV 16-3287, 2017 WL 2972679, at *4 (E.D. Pa. July 12, 2017).

and noting that nature of reputation-based effects of libel justified specific jurisdiction over out-of-state article publisher who knowingly caused reputational injury in California). A "single act" can support jurisdiction, in light of the particular claims alleged. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 n.18 (1985). Finally, "physical entry into the State—either by the defendant in person or through an agent … or some other means—is certainly a relevant contact" for specific jurisdiction purposes. *Walden*, 134 S. Ct. at 1122.

Here, Pearce alleges more than just intentional tortious conduct; he alleges that Mizuho directed tortious conduct at him based on his Pennsylvania residency, as part of its larger scheme to interfere with the contracts between Mt. Gox and its customers in the United States. Pearce signed up for Mt. Gox in Pennsylvania, relying on false statements about Mt. Gox's reliability—statements Mizuho allowed to be published without correction, in furtherance of its scheme to harm Mt. Gox's American customers. (Compl. ¶¶ 29–34, 42–43.) Mizuho implemented banking policies focused on interfering with the contracts between Mt. Gox and Pearce (and those like him), hoping pressure from Mt. Gox's customers in Pennsylvania and other states would push Mt. Gox away. (*Id.* ¶¶ 24–28.) And when Pearce requested to withdraw funds from Mt. Gox, the exchange was unable to process his transaction due to Mizuho's conduct. (*Id.* ¶¶ 46, 50.) These allegations establish that Mizuho purposefully directed its acts towards Pennsylvania, among other states. *See Christie v. Nat'l Inst. for Newman Studies*, 258 F. Supp. 3d 494, 503 (D.N.J. 2017) (jurisdictional inquiry should focus on where party intended conduct to be felt and whether it should have known harm would be felt in forum state); *Acorda Therapeutics Inc. v. Mylan Pharm. Inc.*, 817 F.3d 755, 759–60 (Fed. Cir. 2016) (jurisdiction found even though planned in-state drug marketing, sales, and other planned actions were based on a regulatory filing made out-of-state); *Pennsylvania by Shapiro v. Think Fin., Inc.*, No. 14-CV-7139, 2018 WL 637656, at

*5 (E.D. Pa. Jan. 31, 2018) (suit-related contacts sufficient where party participated in payday loan scheme targeted at Pennsylvania, among other states).

While Mizuho is correct that a plaintiff's residency—considered by itself—generally cannot create personal jurisdiction over a defendant, the "nature of the … tort" at issue can connect a defendant's out-of-state conduct to the forum. *Walden*, 134 S. Ct. at 1124. Consider the tort at issue here. The heart of any claim for tortious interference starts with a contract; and here, the contract at issue was one between Mt. Gox and Pearce, a Pennsylvanian, and focused on the bitcoin investing activities (including the withdrawal of currency from the exchange) that Pearce would conduct in and from his home state. (Compl. ¶¶ 3, 10–12, 42, 79.) In addition, the claim requires showing interference with Pearce's contract; and here, Mizuho's interference was not complete until Pearce's Pennsylvania-based attempt to withdraw money from Mt. Gox failed. Mizuho's interference only took place *because of* Pearce's Pennsylvanian origin, as one part of Mizuho's overall plans to harm Mt. Gox's contracts with its American customers (if Pearce had been one of Mt. Gox's Japanese customers, for example, his contract would not have been targeted by Mizuho). (*Id.* ¶ 46.) Finally, a tortious interference claim requires alleging harm; and here, the harm suffered because of Mizuho's interference (*i.e.*, when Pearce lost all of his deposited funds and bitcoin) was undeniably felt by Pearce in Pennsylvania. Accordingly, in light of the specific tort at issue, this Court has specific jurisdiction over Mizuho. *See Pennsylvania by Shapiro*, 2018 WL 637656, at *5. (suit-related contacts sufficient where party participated in scheme targeted at Pennsylvanians); *Acorda Therapeutics Inc.*, 817 F.3d at 759–60 (finding personal jurisdiction due to nature of copyright infringement action despite lack of relevant in-state contacts).

For its part, Mizuho argues that all of its relevant actions took place in Japan. (Dkt. 11-2, "Mot." at 2.) In support of this, Mizuho submits a declaration stating that it "does not have any branch offices or representative offices in Pennsylvania." (dkt. 11-3, ¶ 4). This is not entirely correct, as Mizuho Securities USA LLC, a subdivision of Mizuho's corporate parent, has a branch office in Philadelphia.[2] That Mizuho's parent company entered Pennsylvania to operate a firm that traded securities, while interfering in Mt. Gox customers' contractual right to freely move funds in and out of a trading platform like Mt. Gox, is relevant to the inquiry and supports personal jurisdiction, here. *Walden*, 134 S. Ct. at 1122 (physical entry into the forum "is certainly a relevant contact" for personal jurisdiction purposes); *see also, e.g.*, *Acorda Therapeutics Inc.*, 817 F.3d at 759–60 (personal jurisdiction over drug company in Delaware proper where "suit-related" conduct occurred wholly outside Delaware but was related to other conduct in-state, including company's business presence). More importantly, as discussed above, Mizuho's argument emphasizes the home countries of Mizuho and Mt. Gox over and above nearly every other allegation in this case, including the ones that matter most: namely, those tying Pearce's tortious interference claims to Pennsylvania.

Mizuho also argues that Plaintiff alleges no conduct directed at Pennsylvania. (Mot. at 2.) Not so. As discussed above, Mizuho's intentional conduct was directed at Pennsylvania and Pennsylvanian Mt. Gox users like Pearce, as a part of its scheme to disrupt Mt. Gox's relationship with its American users. Mizuho intentionally acted to prevent Mt. Gox from fulfilling its contract with Pearce, including after Pearce asked Mt. Gox to fulfill a withdrawal request. (Compl. ¶¶ 2, 24–25, 29–34, 46.) Mizuho did not process that request *solely* because Pearce's residency placed him within the scope of Mizuho's plan to force Mt. Gox to take its

---

[2] *See* Location of Offices Outside Japan (As of June 30, 2017), Mizuho Financial Group, Inc., https://bit.ly/2INeizn (last accessed May 25, 2018).

9

banking business elsewhere.[3] (*Id.* ¶¶ 2, 25.) Thus, Mizuho acted with Pennsylvania in mind, and purposefully directed its intentional acts of interference and concealment at Pennsylvania, among other states. *See Nat'l Inst. for Newman Studies*, 258 F. Supp. 3d at 503 (jurisdictional inquiry should focus on where party intended conduct to be felt and whether it should've known harm would be felt in forum state).

Mizuho also suggests that this issue was already addressed—and resolved in Mizuho's favor—by the district court in *Greene*. (Mot. at 7 (citing *Greene v. Mizuho Bank, Ltd.*, 169 F. Supp. 3d 855, 863, 865 (N.D. Ill. 2016)).) But the cited *Greene* analysis does not cover the facts at issue here, including because the court there did not assess personal jurisdiction in the context of a tortious interference claim. *Walden*, 134 S. Ct. at 1126. In *Greene*, the court found that Mizuho had "no transactional contacts with [plaintiff Greene] at all," because Greene did not even attempt to withdraw fiat currency from Mt. Gox. 169 F. Supp. 3d at 865. Here, in contrast, Pearce alleges the interaction that Greene lacked: an attempt to withdraw money from the Mt. Gox exchange that, but for Mizuho's interference aimed at Mt. Gox's U.S.-based customers, would have been received and processed by the bank. And because this attempted (but unsuccessful) transactional contact only arose *because of* Pearce's residency in Pennsylvania, this case succeeds where Greene's failed. *See Keeton v. Hustler Magazine Inc.*, 465 U.S. 770, 780 (1984) ("Plaintiff's residence may be the focus of the activities of the defendant out of which the suit arises" for purposes of personal jurisdiction).

This Court has specific jurisdiction over Mizuho.

---

[3] That Mizuho's conduct was directed at users in other states does not detract from the Court's analysis of the bank's contacts with Pennsylvania. *See, e.g.*, *Acorda Therapeutics*, 817 F.3d at 759 (fact drug marketing would also be directed at other states does not defeat jurisdiction in forum state); *Payton v. Kale Realty*, No. 13c 8002, 2014 WL 4214917, at *4 (N.D. Ill. Aug. 26, 2014) (fact defendants aimed tortious products to residents in all fifty states did not render subsequent sales to Illinois residents to be fortuitous contacts).

**II.     The Complaint States Claim for Tortious Interference With Contract.**

Under Fed. R. Civ. P. 12(b)(6), a plaintiff must plead sufficient factual matter to state a claim for relief that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In evaluating a motion to dismiss under Rule 12(b)(6), "courts [must] accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (citing *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002). Detailed factual allegations are not required. *Ashcroft*, 556 U.S. at 678. Instead, this standard "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of" the necessary element." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010) (internal quotation omitted).

Pennsylvania has adopted the Restatement (Second) of Torts's approach to tortious interference with contractual relationship claims. *Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc.*, 982 A.2d 94, 97 (Pa. Super. Ct. 2009). Such a claim requires "(1) the existence of a contractual relationship between the complainant and a third party; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship; (3) the absence of privilege or justification on the part of the defendant; and (4) … actual damage as a result of defendant's conduct." *Empire Trucking Co. v. Reading Anthracite Coal Co.*, 71 A.3d 923, 933 (Pa. Super. Ct. 2013) (internal quotation omitted). Mizuho argues that the Complaint fails to allege any intent to interfere, that Mizuho's conduct was unjustified, or that Pearce suffered injury due to Mizuho's actions. (Mot. at 5.) Each contention fails.

11

### A.    Mizuho Purposefully Intended to Harm Pearce's Relationship With Mt. Gox.

To start, Pearce alleges that Mizuho acted purposefully to harm his contractual relationship with Mt. Gox. To demonstrate intent in a tortious interference claim, a party must allege at least constructive knowledge of the relevant contract. Restatement (Second) of Torts § 766 cmt. *i* ("It is not necessary that the actor appreciate the legal significance of the facts giving rise to the contractual duty, at least in the case of an express contract."); *see also id.* (citing *Bolger v. Danley Lumber Co.*, 395 N.E.2d 1066, 1069 (Ill. App. 1979) (material issue of fact for trial on tortious interference claim where there was some evidence party knew "or should have known" of contract); *Gianacopoulos v. MOS Design, Inc.*, No. CIV.A. 3:05-2417, 2008 WL 1774094, at *6 (M.D. Pa. Apr. 16, 2008) (must show party "knew or had reason to know" of the contract, not knowledge of specific terms). *See also* Fed. R. Civ. P. 9(b) ("[I]ntent, knowledge, and other conditions of a person's mind may be alleged generally."). In addition, intent to interfere with a contract can be shown where an actor knows "the interference is … substantially certain to occur as a result of his action," including "interference … incidental to the actor's independent purpose and desire." Restatement (Second) of Torts § 766 cmt. *j*; *see also id.* § 8A; *Int'l Diamond Imps., Ltd. v. Singularity Clark, L.P.*, 40 A.3d 1261, 1276 (Pa. Super. Ct. 2012).

Here, Mizuho had reason to know and should have known about Pearce's contract with Mt. Gox. Mizuho knew that Mt. Gox was a bitcoin exchange operated for the benefit of its users and sought to interfere with Mt. Gox users' ability to withdraw funds precisely because it knew Mt. Gox had promised users (including American users) they would be able to withdraw funds from their accounts at any time. (Compl. ¶¶ 18, 21–24.) Indeed, Mizuho experienced this first hand, given that—for an extended period of time—it operated as the sole gateway into or out of the exchange for Mt. Gox's American users. (*Id.* ¶ 21.) Mizuho also had ready access to Mt.

Gox's Terms of Use (the basis of users' contract with the exchange, which were freely accessible online) throughout its relationship with Mt. Gox, on top of knowing (as Mt. Gox's banking partner) that Mt. Gox users moved funds into and out of the exchange through Mizuho-processed wire transfer payments. (*Id.* ¶¶ 10, 18, 21.) And Mizuho had reason to know, as a sophisticated banking entity, that the ability to withdraw currency from the exchange was crucial to users' agreements with Mt. Gox, since bitcoin had little-to-no intrinsic value. (Indeed, the articles Mizuho asks the Court to consider show that it had notice that Mt. Gox users wanted to withdraw their money, and viewed that ability as a crucial to their bargain with Mt. Gox. (*Id.* ¶ 22; dkt. 11-4, exhs. 1–4.)) Thus, Mizuho was aware of all facts needed to put an entity of its sophistication on notice of the contractual relationship between Mt. Gox and its users, the nature of that relationship, as well as the natural effect its decision to unilaterally cut off withdrawals would have: the prevention of Mt. Gox from fulfilling its basic contractual obligations with users. *See, e.g. Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617, 728 (E.D. Pa. 2014) (holding a genuine issue of material fact existed as to whether party had knowledge of contract, where party claimed it had no knowledge of the specific contract at issue, but was aware that "[a]ll employees" were required to sign a non-disclosure agreement); *Empire Trucking Co.*, 71 A.3d at 933 (circumstances of subcontractor performance of contract with plaintiff sufficed to show defendant knowledge of the contract, even though defendant lacked actual knowledge of it).

Mizuho broadly argues that, at the time of its alleged interference, it lacked knowledge of Pearce or his specific contract with Mt. Gox. (Mot. at 9–10.) But as discussed herein, Plaintiff alleges that Mizuho's entire goal was to interfere with the contracts between Mt. Gox and its American (including its Pennsylvanian) customers. That Mizuho remained willfully blind to the details concerning the specific contracts amongst this group is of no moment. *See* Restatement

(Second) of Torts § 766 cmt. *i* (citing as example of "knowledge" *Mid-Continent Tel. Corp. v. Home Tel. Co.*, 319 F. Supp. 1176, 1186 (N.D. Miss. 1970), where party unjustifiably "did not at any time inquire" or "investigate" into the existence of a contract); *Prudential Real Estate Affiliates, Inc. v. Long & Foster Real Estate, Inc.*, 208 F.3d 210 (4th Cir. 2000) (noting "willful blindness" as form of knowledge in tortious interference claim analyzed under § 766); *Synthes*, 25 F. Supp. at 728 (knowledge employees required to sign non-disclosure agreements, generally, sufficient to show knowledge that an individual employee was subject to one); *In re Prithvi Catalytic, Inc.*, 571 B.R. 105, 132 (Bankr. W.D. Pa. 2017) (same, but for non-compete agreements). Here, for example, the only reason Mizuho avoided learning about Pearce's individual contract was because of its unilateral decision to stop processing withdrawal requests altogether. (Compl. ¶¶ 2, 25, 46–47.) Had Mizuho not made this decision, it would have learned —once Mt. Gox submitted the request to the bank—that Pearce was a Mt. Gox customer in a contractual relationship with Mt. Gox. (*Id.* ¶¶ 45–47.)

Next, Mizuho suggests that Plaintiff must allege that Mizuho acted with "malevolent purpose." (Mot. at 10.) This is incorrect. Neither "[i]ll will toward the person harmed … [n]or [] a specific intent to harm" is an element of tortious interference. *Ruffing v. 84 Lumber Co.*, 600 A.2d 545, 550 (Pa. Super. Ct. 1991). Though an errant case (like the one Mizuho cites) may suggest otherwise, this adds a new element to tortious interference claims not required by the Restatement (Second). (Mot. at 10.) As the Pennsylvania Supreme Court has stated, malice is not an independent requirement for a claim of tortious interference—"what is meant is … merely purposeful interference without justification." *Walnut St. Assocs.*, 20 A.3d at 479 n. 9.  As discussed above, Mizuho's interference with Pearce's contract with Mt. Gox was purposeful; as discussed in the following section, Mizuho acted without justification.

14

Finally, Mizuho suggests Pearce fails to allege intent because Mt. Gox may have held accounts at other banks that it could have used to fulfill customers' withdrawal requests. (Mot. at 11.) This argument fails for two reasons. First, it is inappropriate for a Rule 12(b)(6) motion to dismiss, as it relies on material outside of the four corners of the complaint. *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (on Rule 12(b)(6) motion a court must consider "only the complaint, exhibits attached to the complaint, matters of public record," and authentic documents on which the complaint is based). As the *Greene* court noted after Mizuho made similar requests in that case, "accepting at the pleading stage that Mt. Gox could have serviced [customers] … through those other accounts, even though nothing in the complaint suggests that it could have, would require drawing factual inferences against Plaintiffs," which is disallowed on a Rule 12(b)(6) motion to dismiss. *Greene*, 206 F. Supp. 3d at 1371; *see also Phillips*, 515 F.3d at 233. Second, as discussed below in Section II.C, the argument that Mt. Gox is to blame by not using other banks to process withdrawals suggests a superseding cause, which is an affirmative defense. But Plaintiff is only required to plead facts sufficient to establish proximate cause. *See Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-MD-2445, 2017 WL 4910673, at *14 (E.D. Pa. Oct. 30, 2017) (denying motion to dismiss where plaintiff alleged causation, despite possible superseding cause); *McCullough v. Peeples*, No. CIV.A. 3:14-123, 2015 WL 1000223, at *6 (W.D. Pa. Mar. 5, 2015) (same). That Mizuho may assert defenses down the line—which rely on extrinsic facts—has no bearing on whether Pearce sufficiently alleges a plausible claim to relief.

### B.     *Mizuho's Conduct Was Unjustified.*

Next, Mizuho's conduct was also unjustified. The propriety of any interference with a contract must be assessed in light of "(a) the nature of the actor's conduct; (b) the actor's motive;

15

(c) the interests of the others with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties." *Walnut St. Assocs., Inc.*, 982 A.2d at 98; *See* Restatement (Second) of Torts § 767. Overall, a party's conduct must comport with the "rules of the game." *Salsgiver Commc'ns, Inc. v. Consol. Commc'ns Holdings, Inc.*, 150 A.3d 957, 968 (Pa. Super. Ct. 2016) (quoting *Glenn v. Point Park Coll.*, 272 A.2d 895, 899 (1971)).

Here, these factors show that Mizuho's conduct lacked justification. The Complaint provides that Mizuho was immediately and directly involved in the interference caused by its conduct. (Compl. ¶¶ 22–28.) Mizuho deliberately concealed these actions, allowing Mt. Gox users to be lulled into believing that they could use the exchange to deposit and withdraw fiat currency at will. (*Id.* ¶ 23.) Mizuho also affirmatively suppressed Mt. Gox from revealing the truth to its users, and stood silent as Defendant Karpeles misrepresented the reasons for the withdrawal limitations to the public. (*Id.* ¶¶ 28–34.) All the while, Mizuho continued to accept deposits from Mt. Gox users. (*Id.* ¶ 28.) While Mizuho provides reasons for doing so, its conduct was wholly selfish and self-serving, and along with Mizuho's purposeful concealment of its actions removes any potential justification for Mizuho's conduct overall. *See Empire Trucking Co.*, 71 A.3d at 935 (conduct unjustified defendant allowed plaintiff to act on false conception of facts generated by defendant's conduct); *Fishkin v. Susquehanna Partners, G.P.*, 563 F. Supp. 2d 547, 589 (E.D. Pa. 2008) (conduct unjustified where party interfered with contract for purpose of self-enrichment); *see also Total Care Sys., Inc. v. Coons*, 860 F. Supp. 236, 242 (E.D. Pa. 1994) ("knowing and purposeful" interference was unjustified).

16

Furthermore, Mizuho's actions deprived with Pearce and other Mt. Gox users of their ability to withdraw funds from Mt. Gox at will. (Compl. ¶¶ 50–51.) As the *Greene* court observed (and as a common sense dictates), an investment platform with no means of withdrawing the funds deposited is functionally worthless to an investor. *Greene*, 206 F. Supp. 3d at 1375. Society has a strong interest in protecting these types of contractual relationships, as they are a cornerstone of the "rules of the game" for exchanges like Mt. Gox. *See Salsgiver Commc'ns*, 150 A.3d at 968. Were banks able to hold and manage investments on an exchange for consumers while arbitrarily refusing to process their withdrawal requests, the trust required for functioning markets would evaporate, as investors would have no guarantee of ever recovering their investments or gains. This, too, removes any justification for Mizuho's conduct.

For its part, Mizuho's only says that its conduct was justified because of its desire to "protect its legitimate business interests." (Mot. at 11-12 (citing Compl. ¶ 23).) But even assuming there were "legitimate business interests" to protect (Mizuho assumes that the "interests" alleged in the Complaint were "legitimate," but does not explain why), (Mot. at 11-12), "act[ing] to protect a legitimate business interest alone does not privilege" a party's conduct. *Empire Trucking Co*, 71 A.3d at 935; *see also Phillips v. Selig*, 959 A.2d 420, 430 (Pa. Super. Ct. 2008) ("[I]n most cases the defendant's intentional conduct is done 'at least in part for the purpose of protecting some legitimate interest which conflicts with that of the plaintiff.'") (quoting *Glenn*, 272 A.2d at 899). Were Mizuho's view accepted, it would elevate a single factor above all others in the "justification" analysis, allowing party "protect[ing] its legitimate business interests" to avoid liability. This is inconsistent with the Restatement's holistic approach, which requires assessing whether "the action(s) in question were appropriate *under the circumstances*." *Corrections U.S.A. v. McNanyi*, 892 F. Supp. 2d 626, 643 (M.D. Pa. 2012)

17

(emphasis added). In short, even if Mizuho *could* point to a potentially legitimate interest behind its conduct (and tries to do so as the case moves forward), such an interest does not—standing alone—warrant dismissal on the pleadings.

### C.    *Pearce Was Harmed By Mizuho's Tortious Conduct.*

Finally, Pearce's injury allegations are straightforward, and satisfy the requirement that plaintiff allege some actual loss stemming from Mizuho's interference. Restatement (Second) of Torts § 774 (damages in tortious interference claims include any pecuniary and "consequential losses" caused by the interference); *see also Shiner v. Moriarty*, 706 A.2d 1228, 1238 (Pa. Super. Ct. 1998) (same). Pearce alleges that he was harmed by Mizuho's unilateral decision to stop processing withdrawal requests for Mt. Gox. (Compl. ¶¶ 43–49). As a result, Pearce's request to withdraw $5,900—a request that, but for Mizuho's conduct, would have been routinely processed—went unfulfilled. When the exchange shut down Pearce lost his deposited funds specifically because Mizuho did not process the withdrawal, making Mizuho's inducement of Mt. Gox's breach the proximate cause of Pearce's loss. Restatement (Second) of Torts § 766 cmt. *o* (question of causation of harm is whether "actor did in fact induce the third person's" breach); *see Empire Trucking Co.*, 71 A.3d at 936 (causation of harm plus financial injury satisfies the final prong of a tortious interference claim).

Unsatisfied, Mizuho posits that Defendant Karpeles's fraudulent conduct and Mt. Gox's failure to utilize other banks were outside causes of Pearce's losses. (Mot. 12–13.) These arguments are ineffective. With respect to the conduct of Mark Karpeles, intentional tortfeasors' liability extends to any foreseeable and proximate consequence of their conduct—including both Defendants Karpeles and Mizuho—and *any* actor who substantially contributes to a plaintiff's harm is liable for it. Restatement (Second) of Torts § 433B(2). As the *Greene* court found,

Mizuho's argument speaks to remedy—that is, who is *more* liable for Pearce's injury—not liability. *Greene*, 206 F. Supp. 3d at 1376 (allegation that Karpeles acted fraudulently "does not undermine the allegations against Mizuho" because "Plaintiffs seek to hold Mizuho liable for its own" conduct). And whether other banks could have stepped in when Mizuho blocked Mt. Gox's ability to submit withdrawals is a factual question to be tested in discovery—not a point for consideration on a Rule 12(b)(6) motion to dismiss. *See Gomez*, 466 U.S. at 640; *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 2017 WL 4910673, at *14. For the moment, it suffices that Pearce alleges that other banks *couldn't* provide the same level of services to Mt. Gox that Mizuho did. (*See* Compl. ¶ 34.) And looking past the pleading stage, the record amassed in the *Greene* litigation provides factual support for this allegation.

Finally, Mizuho argues that Pearce's "attempted" to halt his withdrawal due the problems Mizuho had caused defeats his claim. (Mot. at 13.) This is irrelevant, as the breach of contract Mizuho induced was complete when Pearce's withdrawal request went unfulfilled, regardless of whether Pearce later attempted to mitigate those losses. *See* Restatement (Second) of Torts § 766 cmt. *h* ("inducing" breach of contract "refers to the situations in which A causes B to choose one course of conduct rather than another" or "leaves B no choice" but to fail to perform). Pearce's attempt to find a work around doesn't erase Mt. Gox's breach of contract, Mizuho's inducement of that breach, or the injury Pearce sustained due to Mizuho's inducement of the breach.

Pearce has alleged injury as a result of Mizuho's conduct and, therefore, has alleged each and every element of his claim for tortious interference with contract.

## CONCLUSION

For the reasons stated above, Mizuho's motion to dismiss should be denied in its entirety.

Dated: June 4, 2018                              Respectfully submitted,

                                                  By: /s/Rafey S. Balabanian
                                                 *One of Plaintiff's Attorneys*

                                                 Rafey S. Balabanian
                                                 rbalabanian@edelson.com
                                                 J. Aaron Lawson
                                                 alawson@edelson.com
                                                 Edelson PC
                                                 123 Townsend Street, Suite 100
                                                 San Francisco, California 94107
                                                 Tel: 415.212.9300
                                                 Fax: 415.373.9495

                                                 *Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 4, 2018, I served the above and foregoing by causing a true and accurate copy of such paper to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system.

s/Rafey S. Balabanian