# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| GREGORY PEARCE, individually and on behalf of all others similarly situated, | : : : | CIVIL ACTION |
| Plaintiff, | : : | |
| | : | No. 18-306 |
| v. | : : | |
| MIZUHO BANK, LTD. and MARK KARPELES, | : : : | |
| Defendants. | : : : | |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                                           **AUGUST 27, 2018**

       Plaintiff Gregory Pearce ("Pearce") initiated this putative class action on January 24, 2018, in this Court. In his Class Action Complaint, Pearce alleges one count of negligence and one count of fraud against Defendant Mark Karpeles ("Karpeles"), the Chief Executive Officer and President of Mt. Gox, on behalf of himself and the "Mt. Gox Class" and one count of tortious interference with contract against Defendant Mizuho Bank, Ltd. ("Mizuho"), a Japanese financial institution based in Tokyo, Japan, on behalf of himself and the "Withdrawal Subclass." (Compl. ¶¶ 58–84.)

       Presently before this Court is Mizuho's Motion to Dismiss for Failure to State a Claim and for Lack of Jurisdiction (Doc. No. 11), Pearce's Response in Opposition to the Motion to Dismiss (Doc. No. 12), and Mizuho's Reply Memorandum of Law in Further Support (Doc. No. 13). For the reasons noted below, Mizuho's Motion to Dismiss for Lack of Jurisdiction is granted. Accordingly, we decline to consider Mizuho's Motion to Dismiss for Failure to State a Claim.

I. **BACKGROUND**[1]

   A. **General Factual Allegations**

This case arises from events preceding the collapse of Mt. Gox, one of the world's most prominent bitcoin exchanges. (Compl. ¶ 9.) Bitcoin is a digital cryptocurrency that is used like money. *See Investor Alert: Bitcoin and Other Virtual Currency-Related Investments*, SEC (May 7, 2014), https://www.investor.gov/additional-resources/news-alerts/alerts-bulletins/investor-alert-bitcoin-other-virtual-currency. It can be exchanged for traditional currencies, such as the U.S. dollar, or used to purchase goods or services. *See id.* Unlike a traditional, fiat currency, bitcoin is not backed by any government or verified through any bank. *See* Jeffrey E. Alberts and Bertrand Fry, *Is Bitcoin a Security?*, 21 B.U. J. Sci. & Tech. L. 1 (2015). Rather, each transaction is "recorded on a decentralized public ledger, called a 'blockchain.'" *See id.*

From the time of its founding in 2009 until its bankruptcy in 2014, Mt. Gox operated as a global exchange for bitcoin. (Compl. ¶¶ 9, 27.) Mt. Gox users had the ability to buy and sell bitcoin "24/7/365 with the world's most sophisticated trading platform," as well as to "securely store [b]itcoin in a virtual 'vault' for safe keeping." (*Id.* ¶ 9.) In order to use Mt. Gox's services, users had to create an account through its website and agree to the Terms of Service, which expressly warranted that Mt. Gox would "hold all monetary sums and all [b]itcoins deposited by each Member in its Account, in that Member's name as registered in their Account details, and on such Member's behalf." (*Id.* ¶ 10.) To create an account, users were required to provide detailed information, including their full name, date of birth, country of birth, physical address, and proof of identity. (*Id.* ¶ 11.) Users could then transfer their previous bitcoins directly into

---

[1] We take the facts alleged in the Class Action Complaint as true, as we must when deciding a motion under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). *See Isaacs v. Dartmouth Coll.*, Civ. No. 13-5708, 2014 WL 4186536, at *5 (E.D. Pa. Aug. 25, 2014) (citing *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002)); *see also Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (citation omitted).

their Mt. Gox account or deposit cash into their account by wiring money to Mt. Gox's Japanese banking partner, Mizuho, and begin making trades. (*Id.* ¶ 12.)

In mid-2013, Mizuho was the exclusive processor of all bank deposits and withdrawals made by Mt. Gox users located in the United States. (*Id.* ¶ 21.) In that capacity, Mizuho facilitated international cash wire transfers from Mt. Gox users into the exchange and processed user requests to withdraw fiat currency from the exchange to their outside bank accounts. (*Id.* ¶ 18.) When a user wished to deposit money in their Mt. Gox account, Mizuho would accept the payment that had been wired through the user's outside banks and deposit the funds into Mt. Gox's Mizuho account. (*Id.* ¶ 19.) Such wire transfers not only designated Mt. Gox as the beneficiary of the wire and Mizuho as the beneficiary's bank, but also included the Mt. Gox user's account number to which the funds were to be directed. (*Id.*) Likewise, when a user wished to withdraw fiat currency from their Mt. Gox account, Mt. Gox would provide the request to Mizuho for processing. (*Id.* ¶ 20.) Such requests included the user's banking information and the amount to be transferred. (*Id.*) Mizuho would then transfer out the requested amount to the user's outside bank. (*Id.*)

Around this time, Mizuho became increasingly concerned by Mt. Gox's growing transaction volumes amid reports that U.S. authorities were investigating Mt. Gox for business dealings related to money laundering. (*Id.* ¶ 22.) At the same time, Mizuho faced its own legal troubles in Japan, with reports surfacing that the bank had knowingly loaned money to organized crime syndicates and was under investigation by Japan's Financial Services Agency. (*Id.*) For fear of further regulatory scrutiny and reputational harm, Mizuho decided that it wanted to distance itself from Mt. Gox. (*Id.* ¶ 23.) Mizuho wanted Mt. Gox to be the one to officially sever the banking relationship, but Karpeles refused. (*Id.*) Thus, in order to pressure Karpeles

into rethinking his decision and force an end to the banking relationship, Mizuho began implementing a series of new policies, including new measures to refuse to process international wire transfer requests. (*Id.* ¶ 24.) The purpose of these new policies, all of which were kept secret from the public, was to frustrate and disrupt Mt. Gox's business and relationship with its customers. (*Id.*)

Accordingly, in June 2013, Mt. Gox users began to report substantial difficulties in withdrawing cash from their Mt. Gox accounts. (*Id.* ¶ 26.) Mizuho allegedly prohibited Mt. Gox from publicly disclosing that the withdrawal difficulties were attributable to Mizuho or that Mizuho wanted to terminate its banking relationship with Mt. Gox. (*Id.* ¶ 32.) Mizuho never corrected Karpeles' public statements that the delays were temporary and due to a "backlog" in Mt. Gox's system. (*Id.* ¶¶ 30–31.) Instead, Mizuho continued to accept deposits from Mt. Gox users in order to profit from the deposit fees that it collected and to feed into the false narrative that the delays were merely temporary and full service would be restored. (*Id.* ¶¶ 28, 30, 32.)

On February 7, 2014, Mt. Gox halted all user withdrawal requests of bitcoin, leaving many users unable to withdraw bitcoins or fiat currency from their accounts. (*Id.* ¶¶ 33–34.) On February 24, 2014, the Mt. Gox website went dark. (*Id.* ¶ 35.) Users were no longer able to access or view their accounts and a message on the webpage read that a "decision was taken to close all transactions *for the time being*." (*Id.* (emphasis in original)) Then, a few days later, on February 28, 2014, Mt. Gox filed for bankruptcy protection in Japan. (*Id.* ¶ 36.)

### B. Factual Allegations Relating to Pearce

Pearce joined Mt. Gox in or around November 2013. (*Id.* ¶ 42.) After creating his account with Mt. Gox, Pearce transferred his previously purchased bitcoins to his account and began to sell and trade through Mt. Gox. (*Id.* ¶ 43.) Pearce paid transaction fees to Mt. Gox on

4

every trade, in part, to be able to buy, sell, trade, and withdraw bitcoins, and also, in part, to maintain and protect his bitcoins. (*Id.* ¶ 44.)

In January 2014, Pearce converted some of his bitcoin to fiat currency with the intention of immediately withdrawing $5,900 USD[2] from his Mt. Gox account. (*Id.* ¶ 45.) On January 29, 2014, Pearce submitted a withdrawal request for $5,900 from his Mt. Gox account, with instructions to deposit the funds in his U.S. bank account. (*Id.* ¶ 46.) That same day, Pearce received an email from Mt. Gox confirming that the withdrawal request had been received. (*Id.*) However, Pearce never received his funds and, on February 10, 2014, He received a message from Mt. Gox customer support indicating that all international withdrawals were delayed. (*Id.* ¶ 47.) Pearce started to become concerned when he began reading negative press about the then-current status of the exchange and, in need of cash to pay his bills, attempted to cancel his fiat currency withdrawal request and move his entire bitcoin balance out of Mt. Gox. (*Id.* ¶ 48.) He was unable to do so and, shortly thereafter, Mt. Gox went dark. (*Id.* ¶¶ 48–49.)

At no point prior to or during the transfer of his bitcoins into the Mt. Gox exchange did Mt. Gox or Mizuho notify Pearce that Mt. Gox had suffered any type of computer "bug"; that Mizuho was no longer providing withdrawal services to Mt. Gox users; or that either bitcoin or fiat currency funds would be permanently inaccessible. (*Id.* ¶ 50.) Had Pearce known that Mizuho was interfering with Mt. Gox's ability to service users; that his ability to make cash withdrawals from the exchange would be materially compromised; that the security of Mt. Gox had been compromised; or that Mt. Gox intended to go offline and declare bankruptcy, he would not have opened his account with Mt. Gox or transferred his bitcoins into the exchange, and/or would have taken immediate steps to withdraw his bitcoins from the exchange. (*Id.* ¶ 51.)

---

[2] All references to monetary amounts are based on U.S. Dollars (USD).

## II. LEGAL STANDARD

When a court decides a motion to dismiss under Rule 12(b)(2), it must consider allegations made by plaintiff as true and construe all disputed facts in favor of the plaintiff. *See Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002); *Isaacs v. Trustees of Dartmouth College*, Civ. No. 13-5708, 2014 WL 4186536, at *5 (E.D. Pa. Aug. 25, 2014). However, the court's analysis is not limited to the pleadings and the court may consider affidavits and "other competent evidence submitted by the parties." *Isaacs*, 2014 WL 4186536, at *5 (citing *Patterson by Patterson v. FBI*, 893 F.2d 595, 603–04 (3d Cir. 1990)). Since a Rule 12(b)(2) motion is "inherently a matter which requires resolution of factual issues outside the pleadings," the plaintiff may not "rely on the bare pleadings alone in order to withstand a . . . motion to dismiss for lack of in personam jurisdiction." *Patterson*, 893 F.2d at 603–04 (quoting *Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 77 n.9 (3d Cir. 1984)). Though the plaintiff initially need only allege "sufficient facts to establish a prima facie case of jurisdiction . . . , [o]nce those allegations are contradicted by an opposing affidavit, . . . plaintiff[] must present similar evidence in support . . . ." *Isaacs*, 2014 WL 4186536, at *5 (citing *Patterson*, 893 F.2d at 603–04; *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 556 (M.D. Pa. 2009)).

## III. DISCUSSION

Mizuho argues (1) that this Court lacks personal jurisdiction to hear the claim brought against it and (2) that Pearce fails to state a claim for tortious interference with contract. Mizuho requests that this Court dismiss Pearce's claim with prejudice.

For the following reasons, we find that this Court, indeed, does not have personal jurisdiction over Mizuho. Accordingly, we decline to consider whether Pearce has properly pleaded a claim of tortious interference against Mizuho.

A. **Constitutional Limits of Personal Jurisdiction**

To determine whether personal jurisdiction exists, a district court must conduct a two-step analysis. First, the court must look to the forum state's long-arm statute to determine if personal jurisdiction is permitted over a defendant. Second, the court must determine whether the exercise of jurisdiction violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See Kabbaj v. Simpson*, 547 F. App'x 84, 86 (3d Cir. 2013); *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 258–59 (3d Cir. 1998); *Vertoex Certainteed Corp. v. Consol. Fiber Glass Prods. Co.*, 75 F.3d 147, 150 (3d Cir. 1996).

Pennsylvania's long-arm statute permits the exercise of personal jurisdiction to the fullest limits of Fourteenth Amendment. 42 Pa. Cons. Stat. § 5322(b); *Verotex*, 75 F.3d at 150. "Personal jurisdiction under the Due Process Clause depends upon 'the relationship among the defendant, the forum, and the litigation.'" *Kabbaj*, 547 F. App'x at 86; *IMO Indus. Inc.*, 155 F.3d at 259 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)). If the plaintiff's claim does not arise from the defendant's contacts with Pennsylvania, this Court could exercise general jurisdiction only if we determine that the defendant has "continuous and systematic" contacts with Pennsylvania. *See id.* at 86 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 & n.9, 416 (1984)). However, if the plaintiff's cause of action arose from the defendant's contacts with Pennsylvania, we could exercise specific jurisdiction over the defendant if we find that he or she has sufficient minimum contacts with the forum and if the exercise of jurisdiction would "comport with traditional notions of fair play and substantial

7

justice." *See id.* at 86–87 (quoting *IMO Indus., Inc.*, 155 F.3d at 259). To determine whether the defendant has minimum contacts with the jurisdiction, we must look to whether the defendant has "purposefully avail[ed] [him]self of the privilege of conducting activities within [the forum]." *See id.* at 87 (first and second alterations in original) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

B. **General Jurisdiction**

We initially find that we lack general jurisdiction over Mizuho. It is readily apparent from the pleadings and Mizuho's Motion that Mizuho is a Japanese financial institution that is not "at home" in Pennsylvania nor has any "continuous contacts" with the forum. (Compl. ¶ 5; Def.'s Mem. Law in Supp. Mot. to Dismiss 6; Ex., Declaration of Yasuo Imaizumi.) In a signed declaration submitted in support of Mizuho's Motion, Yasuo Imaizumi, a Deputy General Manager, Legal Division of Mizuho, states that: (1) Mizuho is incorporated and located in Tokyo, Japan; (2) Mizuho has no branch offices or representatives in Pennsylvania; (3) Mt. Gox opened its bank accounts at a Mizuho branch office located in Tokyo, Japan; (4) Mizuho did not open or make any decisions regarding bank accounts belonging to Mt. Gox in Pennsyvania; and (5) Mt. Gox users made withdrawal requests directly to Mt. Gox, not Mizuho, and Mizuho, in accord with its general practice and Japanese banking laws, does not communicate with its customer's customers. (Def.'s Mem. Law in Supp. Mot. to Dismiss Ex., Declaration of Yasuo Imaizumi.)

However, in support of general jurisdiction, Pearce raises the tenuous argument that a Mizuho subdivision, Mizuho Securities USA LLC ("Mizuho Securities"), has a branch office in Philadelphia. (Pl.'s Mem. Law in Opp'n 9.)

While it may be true that Mizuho Securities is an agent of Mizuho, Pearce has not alleged how the activities conducted by Mizuho Securities are at all relevant to this case. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) ("The Due Process Clause . . . gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurances as to where that conduct will and will not render them liable to suit.") "It is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). *See Dejames v. Magnificence Carriers, Inc.*, 654 F.2d 280, 285 (3d Cir. 1981) (citing *World-Wide Volkswagen*, 444 U.S. at 297) (holding derivative benefits may be insufficient to support personal jurisdiction over defendants); *see also Helicopteros*, 466 U.S. at 413; *TriStrata Tech., Inc. v. Neoteric Cosmetics, Inc.*, 961 F. Supp. 686, 691 (D. Del. 1997) ("While seemingly broad in its language, the standard for general jurisdiction is high in practice and not often met.") Mizuho Securities has placed its securities trading services "into the stream of commerce with the expectation that they will be purchased by consumers in [Pennsylvania]," but Mizuho has not done so with its banking services. *See World-Wide Volkswagen*, 444 U.S. at 297. Thus, it does not follow that Mizuho "should have 'reasonably anticipate[d]' being haled into [Pennsylvania] court" for its banking activities. *See id.* Accordingly, this Court does not have general jurisdiction over Mizuho.

### C. **Specific Jurisdiction**

We also find that this Court does not have specific jurisdiction over Mizuho for two reasons: (1) Pearce has not established a prima facie case for specific jurisdiction over Mizuho and (2) Pearce has not met his burden of proof to overcome Mizuho's motion to dismiss.

9

### 1. Alleged Facts Do Not Support a Prima Facie Case of Specific Jurisdiction

#### a. *The Traditional Test*

To establish specific jurisdiction, the Court must conduct a three-part inquiry. *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007). First, the defendant must have "purposefully directed [its] activities" at the forum. *Id.* (quoting *Burger King*, 471 U.S. at 472). Second, the litigation must "arise out of or relate to" at least one of those activities. *Id.* (quoting *Helicopteros*, 466 U.S. at 414). And third, a court may consider whether the exercise of jurisdiction otherwise "comport[s] with 'fair play and substantial justice.'" *Id.* (quoting *Burger King*, 471 U.S. at 476).

To establish the first prong, physical presence within the forum is not required, however, it is necessary that there is a deliberate targeting into the forum by the nonresident defendant. *See id.* at 317. Thus, the "unilateral activity of those who claim some relationship with a nonresident defendant" is insufficient. *See id.* In this case, Mizuho asserts that all claim-related activities occurred in and were directed at Japan. (Def.'s Mem. Law in Supp. Mot. to Dismiss 6 ("[T]he Mizuho employees who made the policies and decisions related to Mt. Gox's bank accounts . . . were located in Japan . . . .")) Mizuho argues that the only relationship between Pearce's claim and Pennsylvania is the fact that Pearce resides there. (*Id.* at 6.) It is well established that a plaintiff's residency alone cannot sustain personal jurisdiction over a defendant. *See, e.g.*, *Walden v. Fiore*, 571 U.S. 277, 284–85 (2014) ("[P]laintiff cannot be the only link between the defendant and the forum."); *Hanson*, 357 U.S. at 253–54 (finding jurisdiction was not predicated on domicile of trust-settlor).

Pearce contends that Mizuho made the decision to interfere with his contract with Mt. Gox *precisely because* he was located in Pennsylvania. (Pl.'s Mem. Law in Opp'n 7, 8.)

However, the alleged act at the heart of Pearce's claim is a negative action. By not fulfilling the withdrawal request, Mizuho failed to direct any activity at Pennsylvania.

To illustrate this point, it is helpful to briefly compare the facts of this case to its sister case in the Northern District of Illinois, *Greene v. Mizuho Bank. Ltd.*, 169 F. Supp. 3d 855 (N.D. Ill. 2016).[3] *Greene* describes, among other things, two similarly situated plaintiffs, Gregory Greene ("Greene"), a resident of Illinois, and Joseph Lack ("Lack"), a resident of California. *Id.* at 858–59. Both men were Mt. Gox users and brought suit against Mizuho following its collapse. *Id.* at 858. As in this case, Mizuho moved to dismiss for lack of personal jurisdiction. *Id.* at 857. The Northern District of Illinois found that Lack had sent Mizuho a wire transfer from his California bank after Mizuho had ceased fulfilling withdrawal requests and that, by accepting the deposit and profiting from the associated fees, Mizuho was aware that Lack was a California resident and was "purposefully exploit[ing] the [California] market." *Id.* at 865 (second alteration in original) (quoting *Advanced Tactical Ordinance Sys. v. Real Action Paintball, Inc.*, 751 F.3d 796, 802 (7th Cir. 2014)). However, the court found that Greene had merely traded bitcoin on Mt. Gox and had never sent any wire transfers or paid any transaction fees to Mizuho. *Id.* at 865. Thus, Greene's argument that Mizuho tortiously interfered with his consumer agreement with Mt. Gox by trying to "undermine Mt. Gox's ability to do business," did not establish the necessary transactional contacts with Mizuho. *Id.*

The facts of Pearce's claim fall somewhere in between those of Lack and Greene. However, the facts in Pearce's claim are more aligned to Greene's because Mizuho never engaged in any transactional contact with Pearce. Therefore, under the facts alleged by Pearce, we do not find that Mizuho created any "relationship among [itself], the forum, and the

---

[3] This case is familiar to both parties, as Pearce was, at one time, a named plaintiff in the case and the law firms and lawyers overlap considerably.

litigation." *See Walden*, 571 U.S. at 284–85 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)). Therefore, Pearce cannot establish the first prong of the prima facie case of specific jurisdiction.

As to the second and third prongs, since we have found that no activities were directed at Pennsylvania, it follows that Pearce's claim cannot "arise out of or relate to" such an activity. Therefore, because Pearce fails to establish the first and second prongs, we need not consider the third prong. *IMO Indus.*, 155 F.3d at 259 (declining to analyze "fair play and substantial justice" standard because plaintiff did not meet its burden to show defendant's minimum contacts with forum).

b. *The* Calder *Effects Test*

This Court acknowledges that jurisdictional questions are fact-intensive decisions. We must make each inquiry on a claim-by-claim basis. *See Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007) (citing *Remick v. Manfredy*, 238 F.3d 248, 255–56 (3d Cir. 2001)). In this case, Pearce alleges a claim of tortious interference with contract against Mizuho. (Compl. ¶¶ 78–84.) Because the claim is an intentional tort, we may conduct the *Calder* "effects test" to analyze specific jurisdiction. *See Marten*, 499 F.3d at 296–97 (citing *Calder v. Jones*, 465 U.S. 783 (1984)) ("The plaintiff can demonstrate a court's jurisdiction over a defendant even when the defendant's 'contacts with the forum alone . . . are far too small to comport with the requirements of due process' under our traditional analysis.")

To establish personal jurisdiction under *Calder*, the plaintiff must show that: (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; and (3) the defendant expressly aimed his tortious conduct at the forum such

12

that the forum can be said to be the focal point of the tortious activity. *IMO Indus.*, 155 F.3d at 265–66. The third prong is a threshold issue, thus we will analyze it first. *Marten*, 499 F.3d 297 ("Only if the 'expressly aimed' element of the effects test is met need we consider the other two elements.")

Initially, Pearce asserts in his Memorandum of Law in Opposition that the "harm suffered because of Mizuho's interference (*i.e.*, when Pearce lost all of his deposited funds and bitcoin) was undeniably felt by Pearce in Pennsylvania." (Pl.'s Mem. Law in Opp'n 8.) However, this is inconsistent with the Class Action Complaint for two reasons. First, Pearce never claims that any loss of bitcoins was a result of Mizuho's conduct. (Compl. ¶ 84 ("As a result of Mizuho's conduct, Plaintiff and the Class have suffered damages in the amount of *currency* they attempted to . . . withdraw from the [Mt. Gox exchange].") (emphasis added).) Second, as discussed above, Pearce never claims that he deposited funds in his Mt. Gox account, through Mizuho or any other bank. (*Id.* ¶¶ 43–45.) Nonetheless, Pearce does allege that he was unable to withdraw $5,900 because Mizuho did not fulfill his withdraw request. (*Id.* ¶¶ 46, 84.)

However, we find that Mizuho did not expressly aim its conduct at Pennsylvania. In order to satisfy this element, a plaintiff must show that the "defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum, and point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum." *Marten*, 499 F.3d at 297–98 (citing *IMO Indus.*, 155 F.3d at 266). "If a plaintiff fails to show that the defendant '"manifest[ed] behavior intentionally targeted at and focused on" the forum . . . ,' the plaintiff fails to establish jurisdiction under the effects test." *Id.* at 298.

It is unclear from the Class Action Complaint whether Mizuho was ever aware of Pearce's withdrawal request. Pearce asserts that he "submitted a withdrawal request [to Mt.

13

Gox] . . . , with instructions to deposit the funds in his U.S. bank account" and that he "received an email from Mt. Gox confirming that the withdrawal request had been received." (Compl. ¶ 46.) Pearce never alleges that Mt. Gox actually sent his request, which would have included details, such as his banking details and address, to Mizuho for processing. Pearce only communicated with Mt. Gox and does not allege any communication took place with Mizuho. (*Id.* ¶ 47.)

If Mizuho never received Pearce's withdrawal request from Mt. Gox, it would be impossible for it to know that Pearce would suffer harm in Pennsylvania because of Mizuho's policy. Likewise, if Mizuho never received Pearce's withdrawal request, there could be no specific activity aimed at Pennsylvania. Therefore, Pearce has not alleged that Mizuho has expressly aimed any conduct at Pennsylvania. Since he cannot meet this prong, Pearce has failed to satisfy the *Calder* test and we need not analyze the remaining two prongs. *Marten*, 499 F.3d 297.

For these reasons, Pearce has not established a prima facie case for personal jurisdiction over Mizuho.

### 2. Pearce Has Not Met His Burden of Proof

Even if Pearce had adequately pleaded a prima facie case for personal jurisdiction, Mizuho has challenged jurisdiction pursuant to Rule 12(b)(2). A Rule 12(b)(2) motion is "inherently a matter which requires resolution of factual issues outside the pleadings, i.e. whether in personam jurisdiction actually lies." *Time Share Vacation Club*, 735 F.2d at 67, n.9. "It is the burden of the plaintiff to prove that the defendant purposefully availed himself of the forum state. To satisfy this burden, 'at no point may the plaintiff rely on the bare pleadings alone, but rather must sustain its burden 'through sworn affidavits or other competent evidence.'" *Isaacs*,

2014 WL 4186536, at *5 (quoting *Patterson*, 893 F.2d at 603–04).  Here, Pearce has failed to supplement his pleadings with actual proofs.

Therefore, Pearce has not met his burden to survive Mizuho's Motion to Dismiss.

## IV. **CONCLUSION**

Based on the foregoing reasons, Mizuho's Motion to Dismiss for Lack of Jurisdiction is granted.  Accordingly, because we have found that this Court does not have personal jurisdiction over Mizuho, we do not decide Mizuho's Motion to Dismiss for Failure to State a Claim.

An appropriate Order follows.