# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSLYVANIA

| | | |
|---|---|---|
| GREGORY PEARCE, individually and on behalf of all others similarly situated, | : : : | CIVIL ACTION |
| Plaintiff, | : : | |
| v. | : : | No. 18-306 |
| MARK KARPELES, an individual, | : : : | |
| Defendant. | : : | |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                                             **JULY 26, 2019**

Presently before this Court is Defendant Mark Karpeles' ("Karpeles") Motion to Dismiss for Lack of Jurisdiction pursuant to Federal Rule of Civil Procedure § 12(b)(2), Plaintiff Gregory Pearce's ("Pearce") Response in Opposition to the Motion to Dismiss, and Karpeles' Reply to Pearce's Response in Opposition to the Motion to Dismiss. For the reasons noted below, Karpeles' Motion to Dismiss for Lack of Jurisdiction is denied.

## I. BACKGROUND[1]

### A. General Factual Allegations

This case arises out of the collapse of Mt. Gox ("Mt. Gox" or the "Exchange"), one of the world's most prominent bitcoin exchanges. (Compl. ¶ 9.) Bitcoin is a digital currency that is used like money. *See Investor Alert: Bitcoin and Other Virtual Currency-Related Investments*, SEC (May 7, 2014), https://www.investor.gov/additional-resources/news-alerts/alerts-

---

[1] We take the facts alleged in the Class Action Complaint as true, as we must when deciding a motion under Federal Rules of Civil Procedure § 12(b)(2). *See Isaacs v. Dartmouth Coll.*, Civ. No. 13-5708, 2014 WL 4186536, at *5 (E.D. Pa. Aug. 25, 2014) (citing *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002)); *see also Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (citation omitted).

bulletins/investor-alert-bitcoin-other-virtual-currency. Bitcoins can be exchanged for other digital currencies or can be exchanged for traditional currencies such as the U.S dollar. *See id.* Each bitcoin is stored in an individual's digital wallet. *See* David Glidera, *Getting Started with Bitcoin*, 32 No.17 WJCOMPI 1, *2 (2015). Mt. Gox touted that it would keep its users' bitcoins safe and that users would be able to retrieve any bitcoins or cash that they had stored on the site. (Compl. ¶ 9.) Mt. Gox, at one point, claimed to be the "world's most established Bitcoin exchange." (*Id.*) However, as the sole controlling force behind Mt. Gox and the designer of its software, Karpeles was aware that there were security "bugs" in the system, but did not make these defects known to the public. (*Id.* ¶¶ 16-17.)

Karpeles is a French citizen who owned and operated the Mt. Gox Bitcoin Exchange.[2] (*Id.* ¶ 4.) He was the CEO of Mt. Gox and "provide[d] overall direction, responsible for supervising main operations and steering the company according to his vision." (*Id.*) As President and CEO, Karpeles was involved in nearly every detail of the Exchange, from the technical (writing and designing the software used to run Mt. Gox) to the operational (handling all of Mt. Gox's third party negotiations and contracts). (*Id.* ¶ 14.) Additionally, Karpeles directed the drafting and dissemination of Mt. Gox's public statements and representations, as well as statements made through Mt. Gox's customer service department, and handled all aspects of Mt. Gox's accounting. (*Id.* ¶ 4.)

In order to use Mt. Gox's services, users had to create an account through its website and agree to the Terms of Service, which expressly warranted that Mt. Gox would "hold all monetary sums and all Bitcoins deposited by each Member in its Account, in that Member's name as registered in their Account details, and on such Member's behalf." (*Id.* ¶ 10.) Users would have

---

[2] Karpeles was the sole shareholder of Tibanne KK, which owns 88% of the shares of Mt.Gox. (Def.'s Mem. of Law in Supp. Mot. to Dismiss, Ex. 1 (Decl. of Mark Karpeles ("Karpeles Decl.")), ¶ 6).

to verify their accounts by providing Mt. Gox with detailed information such as their full name, date of birth, country of birth, physical address, as well as proof of identity. (*Id*. ¶ 11.) Users could then transfer their previous bitcoins directly to their Mt. Gox account or deposit cash into their account by wiring money to Mt. Gox's Japanese banking partners. (*Id*. ¶ 12.) Afterwards, users could begin to make purchases and trades on the Exchange. (*Id*.)

In mid-2013, Mizuho Bank, LTD. ("Mizuho") was the exclusive processor of all bank deposits and withdrawals made by Mt. Gox users located in the United States. (*Id*. ¶ 21.) In that capacity, Mizuho facilitated international cash wire transfers from Mt. Gox users into the Exchange and processed user requests to withdraw fiat currency from the Exchange to their outside bank accounts. (*Id.* ¶ 18.) To facilitate a user's money into the Exchange, Mizuho accepted payments that had been wired by users through their outside banks. (*Id*. ¶ 19.) The wire transfers designated Mt. Gox as the beneficiary of the wire and Mizuho as the beneficiary's bank, but also included the Mt. Gox user's account number to which the funds were to be directed. (*Id.*) Moreover, to withdraw cash from the Exchange, Mt. Gox users submitted requests online through their Mt. Gox account. (*Id*. ¶ 20.) Mt. Gox would compile these requests—which included a user's bank account information as well as the amount to be transferred—and provide the requests to Mizuho for processing. (*Id*.)

Around this time, Mizuho became concerned about Mt. Gox's growing transaction volumes amid reports that U.S. authorities were investigating Mt. Gox for business dealings related to money laundering. (*Id*. ¶ 22.) Accordingly, Mizuho decided to distance itself from Karpeles and Mt. Gox. (*Id*. ¶ 23.) In order to allegedly force an end to their relationship, Mizuho implemented a series of new policies, and ultimately, in June 2013, stopped processing international wire withdrawals for Mt. Gox altogether. (*Id*. ¶¶ 23-24.)

3

In June 2013, Mt. Gox users began to report substantial difficulties in withdrawing cash from their Mt. Gox accounts. (*Id.* ¶ 26.) Despite growing problems with the Exchange's reliability and security, Karpeles repeatedly assured users and the public that delays in processing transactions were due to a temporary backlog and that users' assets were safe. (*Id.* ¶¶ 26, 29.) These public claims were false. (*Id.* ¶ 30.) On February 7, 2014, Mt. Gox halted all user withdrawal requests of bitcoin, leaving many users unable to withdraw bitcoins or fiat currency from their accounts. (*Id.* ¶¶ 33-34.) Karpeles claimed that he had detected "unusual activity" with repsect to the Mt. Gox Bitcoin wallets, but Karpeles concealed the fact that he had been aware of the supposed security "bug" since 2011. (*Id.* ¶ 33.) Moreover, in February 2014, Karpeles made numerous representations to the public and to Mt. Gox users that the withdrawal issues were only temporary and that user assets were safe. (*Id.* ¶ 29.) On February 24, 2014, the Mt. Gox website went dark. (*Id.* ¶ 35.) Users were no longer able to access or view their accounts and a message on the webpage notified visitors that a "decision was taken to close all transactions *for the time being*." (*Id.* (emphasis in original)) Then, a few days later, on February 28, 2014, Mt. Gox filed for bankruptcy protection in Japan. (*Id.* ¶¶ 35-36.) During a press conference, Karpeles revealed that Mt. Gox had lost over $450 million worth of bitcoins through a security breach.[3] (*Id.* ¶ 37.)

B. **<u>Factual Allegations Relating to Pearce</u>**

Pearce created a Mt. Gox account in November of 2013, and he provided Mt. Gox with his West Chester, Pennsylvania, address, as well as proof of his identity. (Pl's Br. in Opp'n Mot. to Dismiss, Ex. 1 (Decl. of Gregory Pearce ("Pearce Decl.")), ¶ 1.) As a result of Mt. Gox's

---

[3] According to Karpeles, he is currently residing in Japan, and the Japanese government has prevented him from leaving. (*See* Def.'s Mem. of Law in Supp. Mot. to Dismiss at 13.)

4

virtual presence, a total of 19,208 addresses associated with Mt. Gox accounts came from Pennsylvania. (Karpeles Decl. ¶ 15.) After creating his account with Mt. Gox, Pearce transferred his previously purchased bitcoins to his Mt. Gox account and began to sell and trade through the Exchange. (Compl. ¶ 43.) In order to to be able buy, sell, trade, and withdraw bitcoins, as well as to maintain and protect his bitcoins Pearce paid transaction fees to Mt. Gox. (*Id*. ¶ 44.) In January 2014, Pearce purchased a "YubiKey" from the Mt. Gox website and requested that it be shipped to his home address in West Chester, Pennsylvania. (Pearce Decl. ¶ 2.) The Mt. Gox website described the YubiKey as a physical item that implemented two-factor authentication when logged into the Mt. Gox website. (*Id*.) In early February 2013, Pearce received the YubiKey at his Pennsylvania address. (*Id*. ¶ 3.)

In January 2014, Pearce converted some of his bitcoin to fiat currency with the intention of immediately withdrawing $5,900 from his Mt. Gox account.[4] (Compl. ¶ 45.) On January 29, 2014, Pearce submitted a withdrawal request for $5,900 from his Mt. Gox account, with instructions to deposit the funds into his U.S. bank account. (*Id.* ¶ 46.) That same day, Pearce received an email from Mt. Gox confirming that the withdrawal request had been received. (*Id.*) However, Pearce never received his funds, and, on February 10, 2014, he received a message from Mt. Gox's customer support indicating that all international withdrawals were delayed. (*Id.* ¶ 47.) During this same time, Pearce attempted to cancel his fiat currency withdrawal request and move his entire Bitcoin balance out of Mt. Gox, but his attempts to transfer his Bitcoin balance out of the Exchange also failed. (*Id.* ¶ 48.)

At no point prior to, or during the transfer of his bitcoins into the Mt. Gox Exchange did Mt. Gox or Mizuho notify Pearce of the following: Mt. Gox had suffered any type of computer

---

[4] All references to monetary amounts are based on U.S. Dollars.

"bug"; Mizuho was no longer providing withdrawal services to Mt. Gox users; and both bitcoin and fiat currency funds would be permanently inaccessible. (*Id.* ¶ 50.) Pearce claims that he would not have opened his account with Mt. Gox or transferred his bitcoins into the Exchange, or would have taken immediate steps to withdraw his bitcoins from the Exchange, if he had known that: Mizuho was interfering with Mt. Gox's ability to service users; his ability to make cash withdrawals from the exchange would be materially compromised; the security of Mt. Gox had been compromised; or Mt. Gox intended to go offline and declare bankruptcy. (*Id.* ¶ 51.)

Pearce initiated this class action suit against Karpeles and Mizuho on January 24, 2018. (Doc. No. 1.) On August 27, 2018, this Court found it did not have personal jurisdiction over Mizuho and dismissed it. *See Pearce v. Mizuho Bank, Ltd.*, Civ. No. 18-306, 2018 WL 4094812, at *7 (E.D. Pa. Aug. 27, 2018). In his Class Action Complaint, Pearce claims one count of negligence and one count of fraud against Karpeles. (Doc. No. 1.) Pearce brings these claims on behalf of himself and the "Mt. Gox Class." (*Id.* ¶¶ 58-84.)

**LEGAL STANDARD**

When a court decides a motion to dismiss under Rule 12(b)(2), it must consider allegations made by plaintiff as true and construe all disputed facts in favor of the plaintiff. *See Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002); *Isaacs v. Trs. of Dartmouth Coll.*, Civ. No. 13-5708, 2014 WL 4186536, at *5 (E.D. Pa. Aug. 25, 2014). However, the court's analysis is not limited to the pleadings and the court may consider affidavits and "other competent evidence submitted by the parties." *Isaacs*, 2014 WL 4186536, at *5 (citing *Patterson by Patterson v. FBI*, 893 F.2d 595, 603-04 (3d Cir. 1990)). Since a Rule 12(b)(2) motion is "inherently a matter which requires resolution of factual issues outside the pleadings," the plaintiff may not "rely on the bare pleadings alone in order to withstand a . . . motion to

dismiss for lack of in personam jurisdiction." *Patterson*, 893 F.2d at 603-04 (quoting *Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 77 n.9 (3d Cir. 1984)). Though the plaintiff initially need only allege "sufficient facts to establish a prima facie case of jurisdiction . . . , [o]nce those allegations are contradicted by an opposing affidavit, . . . plaintiff[] must present similar evidence in support . . . ." *Isaacs*, 2014 WL 4186536, at *5 (citing *Patterson*, 893 F.2d at 603-04; *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 556 (M.D. Pa. 2009)).

## II. DISCUSSION

Karpeles argues that this Court lacks personal jurisdiction to hear the claims brought against him. (*See* Def.'s Mem. of Law in Supp. Mot. to Dismiss at 1.) For the following reasons, we find that this Court has personal jurisdiction over Karpeles.

### A. Constitutional Limits of Personal Jurisdiction

To determine whether personal jurisdiction exists, a district court must conduct a two-step analysis. *See Kabbaj v. Simpson*, 547 F. App'x 84, 86 (3d Cir. 2013). First, the court must look to the forum state's long-arm statute to determine if personal jurisdiction is permitted over a defendant. *Id*. Second, the court must determine whether the exercise of jurisdiction violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Id*; *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 258-59 (3d Cir. 1998); *Vertoex Certainteed Corp. v. Consol. Fiber Glass Prods. Co.*, 75 F.3d 147, 150 (3d Cir. 1996).

Pennsylvania's long-arm statute permits the exercise of personal jurisdiction to the fullest limits of The Fourteenth Amendment. 42. Pa. Cons. Stat. § 5322(b); *Verotex*, 75 F.3d at 150. "Personal jurisdiction under the Due Process Clause depends upon 'the relationship among the

7

defendant, the forum, and the litigation.'" *Kabbaj*, 547 F. App'x at 86 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)). When the plaintiff's claim does not arise from the defendant's contacts with Pennsylvania, this Court will exercise general jurisdiction only if we determine that the defendant has "continuous and systematic" contacts with Pennsylvania. *See id.* (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 & n.9, 416 (1984)). However, when the plaintiff's cause of action arises from the defendant's contacts with Pennsylvania, we will exercise specific jurisdiction over the defendant if we find that he or she has sufficient minimum contacts with the forum and if the exercise of jurisdiction would "comport with traditional notions of fair play and substantial justice." *See id.* at 86-87 (quoting *IMO Indus., Inc.*, 155 F.3d at 259). To determine whether the defendant has minimum contacts with the jurisdiction, we must look to whether the defendant has "purposefully avail[ed] [him]self of the privilege of conducting activities within [the forum]." *See id.* at 87 (first and second alterations in original) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

### B. This Court Has Specific Personal Jurisdiction over Karpeles

1. *Traditional Test*

We find that this Court has specific jurisdiction over Karpeles because he availed himself of the privilege of conducting business in Pennsylvania through soliciting business from Pearce and thousands of other Pennsylvania residents through the Mt. Gox website.

The United States Court of Appels for the Third Circuit has established that personal jurisdiction may be exercised based on a defendant's internet presence. *See Ackourney v. Sonallas Custom Tailors*, 573 F. App'x 208, 211 (3d Cir. 2014); *see also Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1123-24 (W.D. Pa. 1997). Determining if personal

jurisdiction exists requires the court to determine whether the defendant established minimum contacts through cyberspace. *See Ackourney*, 573 F. App'x at 211 (citing *Zippo*, 952 F. Supp. at 1121); *see also Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 452 (3d Cir. 2003) ("[Zippo] has become a seminal authority regarding personal jurisdiction based upon the operation of an internet website."). When analyzing these cases, courts must look to the "nature and quality of commercial activity that an entity conducts over the internet." *See Zippo*, 952 F. Supp. at 1124. Accordingly, there exists a sliding scale that ranges from situations where a defendant uses an interactive commercial website to actively transact business with residents of a forum state (personal jurisdiction exists) to situations where a passive website merely provides information that is accessible to users in the forum state (personal jurisdiction does not exist). *See Ackourney*, 573 F. App'x at 211.

To determine whether personal jurisdiction exists for situations between these extremes, we examine "the level of interactivity and commercial nature of the exchange of information that occurs on the Web site." *Id; see also Toys "R" Us,* 318 F.3d at 452. Moreover, the court must determine whether a defendant "purposefully availed" itself of the privilege of engaging in activity in that state. *See Toys "R" Us*, 318 F.3d at 451. A defendant has "purposefully availed" themselves if their website repeatedly attracts business from a forum or knowingly conducts business with forum state residents via the site. *Id.* at 452; *Doe v. Hesketh*, 15 F. Supp. 3d 586, 597 (E.D. Pa 2014) (stating that "the *Zippo* sliding scale requires some evidence of commercial interactivity with the forum state as where the *Zippo* defendants solicited subscribers and entered into contracts to furnish services to Pennsylvania customers"); *see also UHS of Delaware, Inc. v. United Health Services, Inc.*, Civ. No. 12-00485, 2013 WL 12086321, at *9 (M.D. Pa Mar. 26, 2013) ("[T]he hallmark of a commercial site is not, . . . the users submission or receipt of

9

information, but the clear presence of deliberate and repeated online business transactions through which the host provides a good or service in return for monetary compensation.").

In the present case, we find that the quality and nature of Mt. Gox's internet activity falls at the interactive end of the *Zippo* spectrum. Since Mt. Gox actively transacted business over the internet by providing an interactive website that engaged in business with thousands of Pennsylvania residents, this Court's exercise of personal jurisdiction is proper. *See Burger King*, 471 U.S. at 473 ("We have emphasized that parties who reach out beyond one state and create continuing relationships and obligations with the citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities.") (internal quotation marks omitted). Specifically, we point to Mt. Gox's website, which allows users to: open and manage accounts; provide Mt. Gox with their address and personal information; make purchases and trades on the Exchange; transfer or deposit cash directly into their Mt. Gox accounts; make withdrawals from the Exchange; and allow users to purchase a "YubiKey" that would be sent to their address. (Compl. ¶¶ 11-13, 42-26; Pearce Decl. ¶ 2); *Zippo*, 952 F. Supp. at 1126 (finding jurisdiction when a defendant used a website to "contact with 3,000 individuals and seven internet access providers in Pennsylvania"); *see also Law Sch. Admission Council, Inc., v. Tatro*, 153 F. Supp. 3d, 714, 720-21 (E.D. Pa Dec. 29, 2015) ("[Defendant's] website falls closer to the interactive end of the *Zippo* spectrum . . . visitors can search for various resources . . . [and] have the opportunity to purchase all these resources directly through the website."); *Square D Co. v. Scott Elec. Co.*, Civ. No. 06-00459, 2008 WL 4462298, at *8 (W.D. Pa. Sept. 30, 2008) (ruling that website that required customers to provide phone number and e-mail address to engage in commercial activity supports exercising of jurisdiction under *Zippo* analysis).

Additionally, Karpeles "purposefully availed" himself of the privilege of engaging in activity in Pennsylvania through continually providing services to thousands of Pennsylvania citizens, communicating with Pennsylvania citizens through e-mail and the Mt. Gox support desk, and shipping products to Pennsylvania residents. (Compl. ¶ 46; Karpeles Decl. ¶ 15; Pearce Decl. ¶ 2); *see also Greene v. Karpeles*, Civ. No. 14-1437, 2019 WL 1125796, at *7 (N.D Ill. Mar. 12, 2019) (finding that Karpeles subjected himself to the jurisdiction in Illinois by "encouraging users to create and maintain accounts on Mt. Gox's online platform . . . [and] served in a position of trust that gave rise to ongoing obligations toward and interactions with Mt. Gox users and their property"); *Law Sch. Admission Council*, 153 F. Supp. 3d at 720-21 (finding that a defendant had "purposefully availed" itself of activity in Pennsylvania when Pennsylvania residents made approximately 250 purchases on the defendant's website); *R.Q.C. Ltd. v. JKM Enters., Inc.*, Civ. No. 13-307, 2014 WL 4792148, at *4 (W.D. Pa. Sept. 23, 2014) ("[A] defendant that intentionally conducts business transactions over an interactive website with customers in the forum state has purposefully directed itself of the laws of that forum."); *Gentex Corp. v. Abbott*, 978 F. Supp. 2d 391, 398 (M.D. P.a. 2013) (finding that a defendant had "availed himself" to the forum state when "Defendant's website allowed Pennsylvania residents to make purchases through the site; it was actually utilized to purchase a product that was subsequently shipped into Pennsylvania").

Moreover, Pearce and other Pennsylvania citizens' contacts with the Exchange were not random, isolated, or fortuitous. *See Greene*, 2019 WL 1125796, at *7 (finding that Greene and Motto's contacts with the Exchange were not random, isolated, or fortuitous, but were the product of Mt. Gox's virtual presence in Illinois, as some 7,056 or about 1.5% of the addresses associated with Mt. Gox accounts came from Illinois); *see also Keeton v. Hustler*, 465 U.S. 770,

11

774 (1984) ("[R]egular monthly sales of thousands of magazines cannot by any stretch of the imagination be described as random, isolated, or fortuitous.") Pearce and other Pennsylvania citizens' contacts with the Exchange were the product of Mt. Gox's virtual presence in Pennsylvania that actively transacted business with 19,208 Pennsylvanian citizens, or about 4% of all accounts with listed addresses. (*See* Karpeles Decl. ¶ 15.)

Furthermore, this Court's exercise of personal jurisdiction is supported by our sister case in the United States District Court for the Northern District of Illinois ("Northern District of Illinois"), *Greene*, 2019 WL 1125796, at *7, where the Northern District of Illinois found that it had personal jurisdiction over Karpeles as an individual. *See id*. at *1, 7. In *Greene*, two similarly situated plaintiffs, Gregory Greene ("Greene") and Anthony Motto ("Motto"), both residents of Illinois, created Mt. Gox accounts after relying on Karpeles' representations about the website's security and reliability. *See id* at *2. Like Pearce, both Greene and Motto informed Mt. Gox where they resided. *See id* at *7. When Greene and Motto were unable to withdrawal their funds, they contacted Mt. Gox's customer support desk. *See id*. The support desk made statements concealing Mt. Gox's troubles. *See id* at * 7. Like Pearce, Greene and Motto brought suit against Karpeles following Mt. Gox's collapse. *See id*. at *1.

As in this case, Karpeles moved to dismiss for lack of personal jurisdiction. *See id.* In support of finding jurisdiction over Karpeles, the Northern District of Illinois found that, although Karpeles, himself, did not make the alleged misrepresentations to Greene and Motto, it is sufficient that he allegedly directed his agents to do so given that the agents had notice that the communications concerned Mt. Gox's business with individuals from Illinois. *See id*. at *8 ("Although Karpeles did not himself make the alleged misrepresentations to Greene and Motto, it is enough that he (allegedly) directed his agents to do so given that the agents had notice that

12

the communications concerned Mt. Gox's business with Individuals in Illinois."). The statements provided to Greene and Motto over Mt. Gox's user support desk reinforced Karpeles' false public representations that the February 7, 2014 halt to withdrawals and February 24, 2014 shutdown were only temporary. *See id*. at *7 ("These communications reinforced Karpeles' public representations that the February 7 halt of withdrawals and February 24 shutdown were only temporary interruptions.") Accordingly, the *Greene* Court ruled that Karpeles cannot avoid jurisdiction on the basis that only his agents knew that their communications with Greene and Motto related to Mt. Gox's business in Illinois. *See id* at *8.

Lastly, this Court's exercise of personal jurisdiction is supported by another sister case in the United States District Court for the Central District of California ("Central District of California"), *Lack v. Mizuho Bank*, No. 2:18 Civ. 00617-RGK-GJS (C.D. Cal. June 24, 2019). In *Lack*, plaintiff Joseph Lack ("Lack"), a resident of California, became a Mt. Gox user and wired $40,000 to his account on January 2014. *See id*. at 3. Like Pearce, Lack provided Mt. Gox with his address. *See id*. at 7. On February 24, 2014, when Mt. Gox "went dark" Lack attempted and failed to withdraw his $40,000. *Id* at 3. Like Pearce, following Mt. Gox's collapse, Lack brought suit against Karpeles claiming negligence and fraud. *See id*. at 1.

Again, in this case, Karpeles moved to dismiss for lack of personal jurisdiction. *See id*. In support of finding jurisdiction over Karpeles, the Central District of California found that Lack and other California customers used Mt. Gox's highly interactive website. *See id* at 7 ("When a defendant operates an internet website, 'the nature of the website has jurisdictional significance' when 'the website allows the defendant to maintain some ongoing contact with the forum state as well as every other state that can access the site.'"). Additionally, it found that since Lack, and other Californian users, provided Mt. Gox with their California addresses,

13

Karpeles had access to the data indicating that Mt. Gox had customers in California. *See id*. As a result, the court ruled that Karpeles engaged in intentional acts that created contacts with California by intentionally allowing users to open accounts that he knew originated in California, while simultaneously failing to disclose material information to those California users. *See id*. Consequently, the court concluded that personal jurisdiction was proper. *See id*. The facts of Pearce's claim are similar to those of Greene, Motto, and Lack, and following the reasoning of both sister cases in the Northern District of Illinois and the Central District of California, Karpeles has sufficient minimum contacts with the Eastern District of Pennsylvania to establish personal jurisdiction.[5]

2. *Karpeles as an Individual*

Karpeles argues that the contacts created by the Mt. Gox website do not relate back to him as an individual. (*See* Def.'s Reply Mem. of Law at 6.) Under the Corporate Shield Doctrine, individuals performing acts in a state in their corporate capacity are not subject to personal jurisdiction of the courts of that state for those acts. *See Biss v. Gehring-Montgomery, Inc.*, No. 16-4472, 2017 WL 2224977, at *5 (E.D. Pa May 22, 2017) (citing *Bowers v. NETI Techs, Inc.*, 690 F. Supp. 349, 357 (E.D. Pa 1988)). However, a corporate agent may be held personally liable for torts committed in their corporate capacity. *See id*. In order to determine whether a corporate officer will be subject to personal jurisdiction, the following factors should be examined under a case-by-case approach: "the officer's role in the corporate structure, the quality of the officer's contacts, and the extent and nature of the officer's participation in the

---

[5] Because Karpeles is subject to personal jurisdiction under traditional specific jurisdiction, the Court does not reach the question of whether he is subject to personal jurisdiction on his fraud claim under the *Calder* effects test. *See Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 96 n. 2 (3d Cir. 2004); *Lutz v. Rakuten, Inc.*, 376 F. Supp. 3d 455, 476 n.2 (E.D. Pa. Apr. 22, 2019).

alleged tortious conduct." *Mendelsohn, Drucker & Assocs. v. Titan Atlas Mfg., Inc.*, 885 F. Supp. 2d 767, 784 (E.D. Pa. Aug. 2, 2012); *see also TJS Brokerage & Co., Inc. v. Mahoney*, 940 F. Supp. 784, 788-89 (E.D. Pa. 1996). An officer's role in a company may satisfy the test where the officer was a "key player in the corporate structure," *Rittenhouse & Lee v. Dollars & Sense, Inc.*, Civ. No. 83-5996, 1987 WL 9665, at *5 (E.D. Pa. Apr. 15, 1987), "with apparent authority to commit the corporation in contractual discussions and obligations," *Elbeco Inc.* v. *Estrella de Plato, Corp.*, 989 F. Supp. 669, 676 (E.D. Pa. 1997). An officer's contacts and participation may satisfy the test where he was so substantially involved with the plaintiff and the alleged tort that "he should not be permitted to use the corporate shield to protect himself from liability." *Rittenhouse*, 1987 WL 9665, at *5.

Karpeles was a "key player" in Mt. Gox's corporate structure. He was the CEO, majority owner, and president, who controlled all aspects of Mt. Gox's business from the ground up and was involved in nearly every detail of the Exchange. (Compl. ¶ 4.) This included producing and designing the software used to run Mt. Gox. (*Id.*) Additionally, Karpeles directed the drafting and dissemination of Mt. Gox's public statements and representations, and served in a position of trust that gave rise to ongoing obligations toward, and interactions with, Mt. Gox users and their property. (*Id.* ¶¶ 14-15); *see also Lack,* No. 2:18 Civ. 00617, at 8 ("Karpeles initiated communications with all of Mt. Gox's users—including Lack and other California users—that encouraged users to create and maintain accounts, while withholding critical information about the exchange."); *see also Greene*, 2019 WL 1125796, at *7 (finding that Karpeles' role in Mt. Gox created a position of trust that Motto and Greene relied upon when creating their Mt. Gox accounts). Regarding the quality of Karpeles' contacts with Pennsylvania and his participation in the tortious conduct, as noted above, Karpeles ran and controlled a website that did business

15

with thousands of Pennsylvania residents. (Karpeles Decl. ¶ 15) Additionally, fraudulent statements were made through Mt. Gox's customer support desk and sent to Pearce at the direction of Karpeles. (Compl. ¶¶ 47, 72); s*ee Greene*, 2019 WL 1125796, at *7 ("Karpeles authorized responses from the customer service desk that concealed this reality and implied that the exchange was operating as usual."). Moreover, Karpeles made false statements about the security of the Exchange and accepted deposits from Pennsylvania users, including Pearce, who relied on Karpeles' false statements. (Compl. ¶¶ 30, 32, 42, 47.)

Based on this analysis, Karpeles is subject to this Court's personal jurisdiction in his individual capacity. *See Mendelsohn,* 885 F. Supp. 2d at 784-85 (finding that a defendant's title "Chief Executive Officer" and providing false assurances relied upon by customers support the conclusion the defendant was a "key player" and the person responsible for the tortious acts); *Beistle Co. v. Party U.S.A., Inc.*, 914 F. Supp. 3d 92, 96 (M.D. Pa Jan. 31, 1996) (finding individual personal jurisdiction for a corporate officer who "performs basically everything it takes to run [the] business" at issue).

## C. <u>Traditional Notions of Fair Play and Substantial Justice</u>

Having determined that minimum contacts exist, we next consider whether the exercise of jurisdiction would otherwise comport with "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The "traditional notions of fair play and substantial justice" are embodied in the Due Process Clause of the Fourteenth Amendment. *Id*. at 320. The Due Process Clause protects an individual's liberty interest from being subject to the binding judgements of a forum which he has established no meaningful "contacts, ties, or relations." *Burger King*, 471 U.S. at 472 (quoting *Int'l Shoe Co.*, 326 U.S. at 319.) Moreover, the Due Process clause gives a degree of predictability to the legal system by

16

requiring that individuals have a fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign.  *See id*. at 472.

The Supreme Court of the United States has identified the following factors that courts should consider in deciding whether jurisdiction complies with traditional notions of fair play and substantial justice: "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate [and international] judicial system's interest in obtaining the most efficient resolution of controversies."  *Burger King*, 471 U.S. at 477.  Karpeles argues that forcing him to defend this suit in Pennsylvania would offend "traditional notions of fair play and substantial justice." (*See* Def.'s Mem. of Law in Supp. Mot. to Dismiss at 13.)

Karpeles' claim that exercising jurisdiction would be burdensome failed in our sister case in the Northern District of Illinois, and it does so here.  *See Greene*, 2019 WL 1125796, at *9.  According to Karpeles, he faces a burden litigating in Pennsylvania because he currently resides in Japan and, the Japanese government has allegedly forbidden him from leaving.  (*See* Def.'s Mem. of Law in Supp. Mot. to Dismiss at 13.)  However, Karpeles has failed to make a "compelling case" that forcing him to litigate in Pennsylvania would be unreasonable.  *See Burger King*, 471 U.S. at 477 ("Where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.").  Karpeles cites no authority for the proposition that confinement in a foreign country for the alleged conduct underlying a civil suit makes litigating that suit in the forum State unconstitutionally unfair, thereby forfeiting the point.  *See Greene*, 2019 WL 1125796, at *9.  Moreover, "[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum in the

exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *See O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 325 (3d Cir. 2007) (citing *Asahi*, 480 U.S. at 114).

Furthermore, Karpeles claims that Pennsylvania has no particular interest in adjudicating this dispute. (*See* Def.'s Mem. of Law in Supp. Mot. to Dismiss at 13.) However, Pennsylvania has a manifest interest in providing effective means of redress when a foreign defendant reaches into the state and solicits its citizens. *See Burger King*, 471 U.S. at 482-83 (finding states often have a "manifest interest in providing effective means of redress for its residents."); *see also O'Connor*, 496 F.3d at 325; *FFR SE, LLC v. Sanborn*, No. 14-5439, 2015 WL 3970923, at *6 (E.D. Pa. June 30, 2015) ("Pennsylvania has a strong interest in deterring actors from committing torts within its territory.").

Lastly, Karpeles argues that the Japanese civil rehabilitation proceedings provide a more efficient resolution to the controversies of this case. (*See* Def.'s Mem. of Law in Supp. Mot. to Dismiss at 13.) As decided in *Greene*, the interests of neither Pennsylvania nor Pearce are extinguished by the possibility that Mt. Gox's civil rehabilitation proceedings will partially or fully refund Pearce what he lost in the Exchange. *See Greene*, 2019 WL 1125796, at *9 (stating that possibility of full relief in Japanese proceeding is speculative at this point, and such relief would not vindicate plaintiffs' interests of relief under Illinois tort law). The court in *Greene* ruled, and this Court agrees, that because Karpeles allegedly "set up an expansive, sophisticated commercial venture online" that "conduct[ed] business nationwide and was apparently successful in reaching customers across the country . . . , there is nothing constitutionally unfair about allowing . . . , a state with which Karpeles had sufficient minimum contacts[ ] to exercise

personal jurisdiction over" him. *Id*. at *10. As such, we conclude that it would not be constitutionally unreasonable for Karpeles to defend this suit in Pennsylvania.

Consequently, the exercise of personal jurisdiction over Karpeles comports with "traditional notions of fair play and substantial justice."

### III. CONCLUSION

Based on the foregoing reasons, we conclude that personal jurisdiction over Karpeles is proper. Therefore, Karpeles' Motion to Dismiss for Lack of Jurisdiction is denied.

An appropriate Order follows.